**TORIN CORPORATION, Plaintiff,**

v.

**PHILIPS INDUSTRIES, INC., Defendant.**

**No. C-3-80-021.**

United States District Court, S.D. Ohio, W.D.

Sept. 11, 1985.

William S. Rambo, Columbus, Ohio, Theodore R. Paulding, Hartford, Connecticut, for plaintiff.

Nathaniel R. French, Harold H. Croghan, Dayton, Ohio, for defendant.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIM OF INFRINGEMENT AND DEFENDANT'S CLAIM OF INVALIDITY; PATENT IN SUIT HELD INVALID AND NOT INFRINGED; CONFERENCE CALL SCHEDULED TO SET TRIAL DATE ON DEFENDANT'S COUNTERCLAIMS

RICE, District Judge.

Plaintiff Torin Corporation brought this action against Defendant Philips Industries, Inc., alleging that the Lau Preferred Line Propellers, which are manufactured and sold by Defendant, infringed the United States Letters Patent No. 3,147,811. Defendant answered denying that it had infringed and raising certain defenses or claims of invalidity. Furthermore, Defendant counterclaimed charging Plaintiff with patent misuse, unfair competition, violations of the antitrust laws and violations of the Lanham Act, 15 U.S.C. § 1125. At Plaintiff's request, the Court bifurcated the issues raised by the Plaintiff's complaint and Defendant's counterclaim. Thus, trial of this case was limited to the issues of validity and infringement of the patent in suit, as well as on the question of whether Defendant is entitled to an award of attorney's fees under the exceptional case provision of 356 U.S.C. § 285. The Court heard the parties' evidence on these issues without intervention of a jury. Now, the Court, pursuant to Rule 52, Fed.R.Civ.P., makes its findings of fact and sets forth its conclusions of law.

(1) Plaintiff, Torin Corporation (formerly the Torrington Manufacturing Company) is a corporation organized and existing under the laws of Connecticut, and has its general corporate offices in Torrington, Connecticut.

(2) Defendant, Philips Industries, Inc., is a corporation organized and existing under the laws of the State of Ohio and has a regular and established place of business at its Lau Division at 2027 Home Avenue, Dayton, Ohio.

(3) For many years, the Defendant and the Plaintiff have manufactured and sold fan assemblies of the general type disclosed by the patent in suit. The fan assemblies are used in heating, refrigerating, air conditioning systems, and other air moving systems (the HVAC market).

(4) Fan assemblies of this general type have a sheet metal spider which consists of a central hub and arms radiating from the central hub. An apperature is centrally located in the hub. A drive shaft is at-

tached to the hole in the hub. A fan blade is attached to each radial arm of the spider.

(5) The patent in suit, United States Letters Patent No. 3,147,811, entitled "Fan Assembly" ("Klonoski patent"), was issued to Stanley W. Klonoski on September 8, 1964. The general object of the Klonoski patent is "to provide a one-piece spider of sheet metal which is substantially lighter and yet more rigid than similar spiders of known construction, and which exhibits vibration characteristics superior to those of spiders heretofore provided." Pl. Ex. 1. Plaintiff has been at all times and still is the owner of the Klonoski patent.

(6) Prior to 1962 and 1976, respectively, Plaintiff and Defendant sold fan assemblies which incorporated flat spiders. The spiders were manufactured with relatively heavy gauge sheet metal. The radial arms of these spiders were twisted to support the fan blades, which were attached to each arm, at the proper angle for the rotational axis of the fan.

(7) Prior to the spring of 1961, Plaintiff experienced problems with its flat spiders. They had the tendency to vibrate at high speeds, and as a result, there was a breakage problem with the arms of the flat spiders. To resolve these problems, Mr. Kenneth A. Merz, the director of engineering in the late 1960's for Plaintiff's Air Moving Division, charged Klonoski with the task of developing a new spider. Klonoski's primary task was to develop a spider that would not have the same breakage problem as the spiders Plaintiff was then using. Additionally, Klonoski's charge was the development of a spider which could be produced at lesser cost and which would have a higher resonant frequency.

(8) At the time the project was given to him, Klonoski was aware that it was well known art in sheet metal fabrication that the only way to reduce costs would be to incorporate less sheet metal into each spider. This would require the use of a lighter gauge of sheet metal. Merz explained to Klonoski that the only way to achieve a greater resonant frequency in the spiders was to make the new ones stiffer than the flat ones then in use. Additionally, Klonoski knew that the only way to stiffen lighter gauge metal was to emboss it. Klonoski had ready access to, and used, handbook or textbook teachings in order to calculate the stiffness of any cross-section of a spider he would consider using. Klonoski also had available to him Plaintiff's O series fans, small, one-piece fans which have a channel embossed down the center of the arm blade. *See* Def. Ex. VVVV.

(9) By May 4, 1961, Klonoski had reduced a fan to practice, in accordance with the patent in suit. The fan ("Klonoski fan") was constructed with a spider and a number of fan blades equal to the number of radial arms on the spider. The spider was constructed with a lighter gauge of sheet metal than Plaintiffs previously used, flat spiders. A center channel is embossed on each radial arm for added strength, using the same engineering principles as an I-beam. The central hub on the larger, nine inch and twelve inch Klonoski fans is conically raised.

(10) In May, 1961, a prototype of the Klonoski fan had been constructed. For practical purposes, this prototype was indistinguishable from Plaintiff's N series fans which were in use at the time of trial. A sample of the Klonoski fan was shown to Mr. Theodore R. Paulding, Plaintiff's counsel, in May, 1961. Also in May, 1961, a sample of the Klonoski fan was shown to Plaintiff's sales representatives at its annual sales meeting. The majority of these sales representatives are independent, manufacturer's representatives rather than employees of Plaintiff.

(11) In June, 1961, Merz conducted a patentability search in Plaintiff's own files with regard to the Klonoski fan. As a result of this search, Merz sent a letter to Plaintiff's counsel, Paulding, on June 30, 1961. In that letter, Merz brought to Paulding's attention the following patents which were discovered during the course of his search of Plaintiff's files:

Upson Design Patent No. 117,860—November 28, 1938

Wooden Design Patent No. 173,599—November 30, 1954

Jacobs Patent No. 1,404,298—January 24, 1922

Arnold Patent No. 1,430,276—September 26, 1922

Crawford Patent No. 1,508,086—September 9, 1924

Hueglin Patent No. 2,035,479—March 31, 1936

Merz concluded his letter of June 30, 1961, by stating:

This is by no means a complete search as we have only a fraction of the fan patents in our files.

Jacobs is the one which I had in my mind's eye when I suggested searching here. It still looks quite pertinent and I suppose the Examiner would argue that there would be no novelty in connecting the ribs by a completely circular center portion, nor in leaving the ends of the spider arm open as we do in the design under discussion.

Def. Ex. R.

(12) Subsequently, on July 12, 1961, Merz and Paulding met and discussed the possibility that the open ends on the channel portions of the radial arms of the Klonoski spider offered advantages over prior art, particularly Jacobs. As a result, tests were conducted by Plaintiff's personnel in July, 1961, to determine whether the open end of the spider arms had a significant effect on the performance of the tested Klonoski fans. These tests demonstrated that the open-ended spiders did not effect performance. After these tests, Plaintiff conducted no further testing or experimentation on the Klonoski fan.

(13) During the second half of 1961, Merz and Paulding discussed the patentability of the Klonoski fan on a number of occasions. As a result of these discussions, a decision was made to conduct a limited, Patent Office search. Nothing pertinent was found in the course of this search, and no further search was ordered. Additionally, through their correspondence, Merz was able to overcome Paulding's initial reluctance regarding the advisability of applying for a utility patent for the Klonoski fan. Initially, Paulding had favored applying for a design patent rather than a utility patent. Merz convinced Paulding that there were some distinctions between the Klonoski fan and Jacobs. Also, Paulding was persuaded that the anticipated commercial importance of the Klonoski fan militated in favor of such an application.

(14) In November, 1961, Plaintiff decided to build tooling for the commercial production of the Klonoski fan. Production tooling was expected to be ready by January 15, 1962; however, it was not actually ready until April 15, 1962.

(15) On November 28, 1961, Plaintiff addressed Field Sales Memo # 319 (Def. Ex. GGG) to its sales representatives in which the advantages of the Klonoski fans were trumpeted. The memo stated that the fans would be ready for production by January 15, 1962, and it offered photographs of the new spider so that the sales representatives could "understand and describe it sufficiently." However, sales representatives were asked not to order samples until they could be produced off of the production tools, after January 15, 1962. The memo concluded:

We are sure that you will see the advantages of this new product, and will want to bring it to the attention of those customers of yours who are affected in this diameter range. Since we see no reason why any customer would not permit us to make the change where he has previously been sampled with the N24 with the old four bladed spider, we intend to obsolete that design in favor of the new N24-4. Accordingly, we see no reason why the present S24-4 and E24-4 will not become obsolete also in favor of the new fan. Therefore, unless advised by you prior to March 1, 1962, we will automatically switch all 24-4 spider fans over to the new N24-4 with the new spider, by that date.

We feel we are making a significant contribution to the industry by offering this new improved product without a price increase. Present book prices will re-

main the same when using this new spider. Please plug this new design as a Torrington *first*, and a truly significant achievement.

Def. Ex. GGG (emphasis in the original).

(16) At some time before the tooling for the Klonoski fans was complete, Plaintiff produced 100 fans on experimental tooling which were sold to the Carrier Corporation. Most of Plaintiff's customers place their orders 30 to 60 days in advance of the desired delivery date. Based upon this, Merz concluded on November 21, 1962, "[w]ithout further investigation I would say that the first public use was very early in 1962." In connection with the filing of the patent application, neither Plaintiff, nor its counsel, conducted any investigation into the question of whether the Klonoski fan was on sale before December 24, 1961.

(17) The Plaintiff's sales representatives made offers to sell, or sold, Klonoski fans before December 24, 1961.

(18) The Klonoski fan is a visual device. Therefore, someone skilled in the art could recognize and comprehend the essentials of a Klonoski fan from a photograph of same together with the description of the spider contained in Field Sales Memo # 319. Such a photograph was available with the memo. The memo and accompanying photographs were disseminated by Plaintiff's sales representatives to Plaintiff's customers before December 24, 1961. Plaintiff's customers constituted the group of persons most concerned with the art.

(19) On February 14, 1962, S. Smith and Sons, Ltd., filed, on behalf of Plaintiff, British Design Registration Nos. 905,274 and 905,275, which were based on the Klonoski fan. This filing was done ten months before a patent application was filed with the United States Patent and Trademark Office and without having obtained a license to do so. Plaintiff and S. Smith and Sons had a contractual relationship whereby Plaintiff was required to notify S. Smith and Sons when it made or acquired a new invention or device which became "subject to a patent or design application in the USA," so that S. Smith and Sons could prosecute application in countries of Smith's territory. *See* Def.Ex. NNN.

(20) On January 31, 1962, Merz sent three sets of photographs of a Klonoski spider to S. Smith and Sons in anticipation of S. Smith and Sons applying for a British design registration.

(21) After this litigation commenced, Plaintiff discovered that S. Smith and Sons had registered the Klonoski before an application had been filed in this country, without a license to do so. Consequently, in October, 1980, Plaintiff requested a retroactive license from the Patent and Trademark Office. The Patent and Trademark Office granted the requested retroactive license, finding that Merz had acted inadvertently and in ignorance of the law. This Court concurs with the findings of the Patent and Trademark Office.

(22) The Plaintiff drafted an application which was filed with the Patent and Trademark Office on December 24, 1962. The application consisted of one independent claim and six dependent claims. On June 21, 1963, the patent examiner rejected claims 1 through 7 as being indefinite. Additionally, the patent examiner rejected claims 1 through 7 because:

Claims 1–7, as understood are rejected as unpatentable over Zaiger [U.S. Patent No. 2,107,136, Feb. 1, 1938] alone or taken with Posh [U.S. Patent No. 3,044,557, July 17, 1962]. Zaiger shows a fan spider (Figure 3) having an embossed or offset central section 30 which extends radially into the circumaxially spaced arms 3 which obviously are twisted (note Figure 2). The particular central portion 9 of Zaiger is deemed the equivalent of that recited since to construct it to have the recited shape would be obvious. Further Posh discloses a frustoconical central member for a fan spider and to construct the portion 9 of Zaiger to have the shape taught by Posh (Figure 4) would not be unobvious.

(23) Plaintiff did not challenge the examiner's rejection of the patent application. Rather, Merz and Paulding had an inter-

view with the patent examiner after which all the original claims were cancelled and one independent claim and six new, dependent claims, application claims 8 through 14, were substituted for the cancelled claims. Application claim 8, which became claim 1 of the Klonoski patent, was a revision of application claim. Application claim 8 is set forth below with the deletions from application claim 1 in brackets and additions thereto underlined.

1. [A] *The fan combination in a fan assembly of a* one-piece fan spider of sheet metal [material] metal comprising

(a) a generally circular apertured hub section (10) and a plurality of similar generally radially extending circumaxially spaced arms (12) formed integrally at inner end portions with the hub section,

(b) said hub section *being apertured centrally and* having an inner annular portion (20) with front and rear surfaces and which extends approximately in a radial plane and also having an outer and marginal annular portion (22) disposed about said inner portion (20),

(c) *said inner annular portion (20) of the hub section comprising inner and outer zones (24 & 26) the former (24) of which lies adjacent the hub section aperture (18) and is offset forwardly with respect to the latter,*

(d) parts (30) of said marginal portion (22) *of the hub section* between said arms being offset forwardly with respect to adjacent parts (26) of said inner *annular* portion (20),

(e) each of said arms being in an angularly twisted relationship about a radial center line (34) with respect to said inner portion of said hub section and each of said arms having a *relatively wide* central portion (36) *substantially flat throughout a substantial portion of its length* and *relatively narrow substantially flat* opposite side marginal portions (38).

(f) each of said arm marginal portions (38) being offset forwardly with respect to the adjacent arm central portion (36) *to an extent equal to the forward offset of the adjacent part (30) of the marginal portion (22) of the hub section between the arms* and forming a smoothly blending and continuous junction at its inner end with [the adjacent and similarly offset interim part of said marginal portion of the hub section] *said adjacent offset marginal part, and*

(g) *a plurality of separate sheet metal fan blades (14) equal in number to the arms of said spider and attached respectively to front surfaces of said marginal portions (38) of said arms each in radially spaced relationship with the hub section of the spider.*

Uncontroverted Fact 18.

(24) In arguing that the Klonoski fan, as disclosed by the substituted claims, was patentable over prior art disclosed by Zaiger and Posh, Plaintiff stated:

With regard particularly to the limitations of claim 8 in detail, the Examiner's attention is invited to the characterization of the arm central and marginal portions as being *relatively wide and relatively narrow.* This is precisely contra to the Zaiger construction and represents clear structural distinction. Moreover, the limitation is critical with regard to the improved results achieved. Applicant submits that the greatly improved strength and vibration characteristics of his spider and blade assembly can in no way be duplicated with the narrow rib construction of Zaiger.

Secondly with regard to claim 8, the Examiner's attention is invited to the characterization of each arm central portion as "substantially flat throughout a substantial portion of its length." Here, Zaiger discloses an approximately semicircular rib having no relation whatsoever to this limitation. The provision of the substantially flat central portion, taken in combination with the relatively wide and narrow form of the central and marginal arm portions, contributes heavily to the accomplishment of the applicant's improved results.

Def.Ex. B (emphasis in the original).

(25) On January 27, 1964, Plaintiff was issued U.S. Patent No. 3,147,811, the Klo-

noski patent. The Klonoski patent consists of one independent claim, claim 1 (application claim 8) and six dependent claims, claims 2 through 7 (application claims 9 through 14). The language of claim 1 is set forth in Finding of Fact ¶ 23. The language of claims 2 through 7 is set forth below:

Claim 2

A fan assembly as set forth in claim 1 wherein

the central portion of each arm extends through at least one-half the total width of the arm at least at an inner end portion thereof.

Claim 3

A fan assembly as set forth in claim 2 wherein

the width of each said arm central portions is substantially in excess of twice the extent of forward offset of the arm marginal portions.

Claim 4

A fan assembly as set forth in claim 1 wherein

said inner annular zone is substantially conical in form.

Claim 5

A fan assembly as set forth in claim 1 wherein

(a) each of said offset parts between the arms includes a narrow elongated forwardly facing flange and a narrow elongated transition section projecting generally rearwardly therefrom to said inner annular portion of the hub section, and

wherein

(b) each of said offset arm portions includes a narrow elongated generally forwardly facing flange and a narrow elongated transition section projecting generally rearwardly therefrom to the adjacent arm central portion,

(c) said flanges and transitition sections each being continuous and blending gradually at each of said junctions between forwardly offset parts between the arms and forwardly offset arm portions and all of said transition

sections being substantially equal in width.

Claim 6

A fan assembly as set forth in claim 5 wherein

each of said narrow elongated flanges of said forward offset arm portions has longitudinally adjacent inner and outer parts the latter of which is apertured and substantially wider than the former.

Claim 7

A fan assembly as set forth in claim 6 wherein

said central portion of each arm extends throughout the length of the arm to provide a radially open channel behind a fan blade when the latter is mounted on the front face of the flanges of said offset arm portions.

Pl.Ex. 33.

(26) At no time during the proceedings before the patent examiner did Merz or Paulding or any other of Plaintiff's employees disclose to the patent examiner the prior art taught by Jacobs, Wooden or the Torin O series fans. The patent examiner did not discover Jacobs or Wooden during the course of his searches, nor is it likely that he would have.

(27) The most relevant prior art, in addition to that discovered by Zaiger and Posh, are the Jacobs and Wooden patents and the Plaintiff's series O fans.

(28) Zaiger, U.S. Patent No. 2,107,136, discloses a fan constructed with a central core section or spider and fan blades made of flexible material. The hub section of the fan includes a rib. The purpose of these ribs is to add strength and rigidity to the central core section. The blades are integral with the hub and the entire spider is covered with rubber. However, the Zaiger spider could be used to support individually separate metal blades in the same manner as the Klonoski spider. Comparison of cross-section drawings of the hub sections of the Klonoski and Zaiger spiders reveal significant similiarites. The zone inside the rib on the Zaiger spider is offset forwardly, with respect to the bottom of the rib in a

similar fashion to the way that the inner zone on Klonoski is offset with respect to the bottom of its outer zone.

(29) The Jacobs patent, U.S. Patent No. 1,404,298, relates to "metal fans especially adapted for forcing air to pass through radiators of motor vehicles," in other words, radiator fans for automobiles. Def.Ex. G. Its object is "to provide a simple and effective structure ... which will have great strength and which will be so stiff that it will have little vibration and therefore cause a minimum of humming or singing noise." *Id.* The disclosure of Jacobs is succinctly summarized in lines 19–30 of column 1:

> This invention consists of a pair of two-blade members having flat hubs united together so that they blades are evenly spaced, the blades being twisted adjacent the hubs to give them the proper pitch, the metal at the edges of the twisted portions being stretched and arched to give the blades great stiffness.

> It further consists in securing a reinforcing spider to the middle portions of the blade members and in forming this spider with arched ribs to secure greater stiffness.

*Id.*

(30) The Jacobs spider has a spherically bossed hub section and four arms which radiate from the central hub. Each arm has an embossed rib which extends radially from the hub nearly to the end of the arm. Across the arm each rib extends for the major part, and both the rib and arm narrow toward the closed end of the spider. The rib is substantially flat throughout a substantial portion of its length. The marginal flange on each side of each arm is narrow in relation to the width of the rib. The fan blades are attached to the marginal portions of the arms with rivets and welds. The Jacobs fan is attached to its shaft or other support, at the hub, with four bolts. The spherical boss on the center portion of the hub of the Jacobs spider gives a stiffening effect to the hub. The diametrically opposed blades of the Jacobs fan are formed from the same piece of sheet metal; however, a fan could be constructed using four individual blades and essentially the same Jacobs spider.

(31) The patent examiner cited Posh, U.S. Patent No. 3,044,557, as relevant prior art. Posh discloses a multiblade fan constructed by attaching fan blades to a separate spider. The Posh spider contains a hub from which the arms extend. The blades are riveted to the arms.

(32) The Wooden design, patent, U.S. Design Patent No. 173,599, discloses a one-piece propeller type fan. This type of fan was manufactured by the Meier Electric Machine Co., Inc. ("Meier Electric"). In 1960, Meier Electric was purchased by the Lau Blower Company which in turn was purchased by the Defendant in 1970. The Wooden fan has an embossed hub and embossed stiffening ribs on the arms of the fan. The ribs are narrow, relative to the marginal portions of the arms, and substantially flat throughout their length. The marginal portions which extend along the outer edge of each rib form a smoothly bending, continuous junction with the inner ends of the slots between fan blades and the marginal portion of the adjacent arm.

(33) Plaintiff's O-series fans are one-piece, multiblade, propeller type fans. The hub of the O-series fan has an annular stiffening rib with similar ribs extending radially along the neck portion of the blade arms. The O-series fan could be used as a spider with separate blades attached.

(34) In addition to the foregoing prior art, two blower wheels, one manufactured and sold by Lau beginning in 1955 and the other manufactured by Plaintiff before 1961, are relevant. Each includes a back plate with a deeply embossed conic hub section to which the mounting hub is attached.

(35) Based upon the foregoing discussion of the relevant prior art, the Court finds that as of January 1, 1961, before Klonoski received his charge, it was well known art of air moving devices, such as fans and blowers, that embossing a rib or channel on the blade arm of a spider or one-piece fan would strengthen the part so embossed so

as to increase stiffness while minimizing the thickness of metal required. Zaiger, Jacobs, Wooden and Plaintiff's O-series fans all used this technique. It was also well known that the deeper and wider the embossment, the stiffer the arm. Additionally, as of January 1, 1961, the use of a forwardly offset central hub portion of a spider or back plate of a blower wheel was well known art to increase stiffness and to obtain the proper location for mounting with respect to the center of gravity of the hub.

(36) The level of skill required to construct the Klonoski spider was that of a third year engineering student.

(37) The claims of the Klonoski patent, together with its specifications, reasonably apprise those skilled in the art of its scope and utility.

(38) The only prior art before the patent examiner when he issued the Klonoski patent was Zaiger and Posh. Zaiger was the more pertinent of these. Jacobs, Wooden and Plaintiff's O-series fans are more pertinent art than Posh. Jacobs is more pertinent than Zaiger. Merz knew of the pertinence of Jacobs of which he informed Paulding, yet at no time did he or Paulding inform the patent examiner of Jacobs despite the fact that they were aware of the examiner's ignorance.

(39) This failure to disclose Jacobs was done with the intent to obtain a patent fraudulently. Had Merz or Paulding disclosed Jacobs to the patent examiner, the application for a patent on the Klonoski spider would have been rejected as obvious in light of Jacobs.

(40) The arms on Defendant's S10, T.10, Y10 and F12 Preferred Line Propellers do not have relatively wide central portions and relatively narrow opposite sides marginal portions. The fan blades are attached to large, triangular shaped marginal portions.

## II. OPINION

As stated above, the trial of this matter was limited to broad questions of the validity of the Klonoski patent, whether Defendant infringed the patent and whether Defendant is entitled to an award of attorney's fees under the exceptional case provision of 35 U.S.C. § 285.[1] Initially, the Court will address the question of the Klonoski patent's validity. This will involve a discussion of the various defenses raised by the Defendant. Next, the Court will turn to the question of whether the Defendant's Lau Preferred Propellors infringed the patent in suit.[2] Finally, the Court

---

1. Plaintiff also presented evidence that Defendant's asserted infringement of the patent in suit was willful, thus entitling it to treble damages. Because the Court concludes that the patent in suit is not valid and that even if valid Defendant did not infringe it, it is not necessary for the Court to resolve this question. However, in order to present the most complete case possible to the Court of Appeals in the event that appellate review is sought, the Court will address the question of willful infringement.

Under Section 35 U.S.C. § 284, a court may award increased or treble damages when an infringer's conduct is intentional, willful and made with reckless disregard of the patent owner's patent rights. See, e.g., Ralston Purina Co. v. Far-Mar-Co., Inc., 586 F.Supp. 1176, 1226 (D.Kan.1984). Herein, the uncontroverted evidence is that Plaintiff did not stamp "patent" or "pat." together with the number of the Klonoski patent on any of its products. The only evidence introduced by Plaintiff which would tend to demonstrate that Defendant willfully infringed the patent in suit was the fact that the Klono-

ski patent appeared in *Air Conditioning Refrigeration News,* a publication widely circulated throughout the air conditioning industry, in 1965, some nine years before Defendant began to develop its Preferred Line Propellers which are the subject of Plaintiff's allegation of infringement. Plaintiff offered no evidence that Defendant or its predecessors actually were aware of its patent rights or saw the article. Rather, Plaintiff would have the Court find willfulness solely on the wide circulation of *Air Conditioning Refrigeration News.*

Under these circumstances, if the Court had concluded that the Klonoski patent is valid and if the Court had concluded that Defendant's Preferred Line Propellers infringed the patent in suit, the Court would not find that such infringement willful. Accordingly, the Court would decline to exercise its discretion under § 284 and award treble or increased damages.

2. Initially, Plaintiff alleged that all of Defendant's Preferred Line Propellers infringed the patent in suit. However, after discovery, Plaintiff limited its claim of infringement to Defend-

will address Defendant's request for attorney's fees under § 285.

## (A) *Validity*

To determine whether the Klonoski patent is valid, the Court must address the Defendant's many defenses. Specifically, Defendant argues that the patent in suit is invalid because it was on sale more than one year before the patent was applied for, because of prior publication, because of indefiniteness, obviousness, fraud upon the Patent and Trademark Office and foreign filing. The Court will first address the question of the burden of proof which Defendant must meet in order to demonstrate that the Klonoski patent is invalid. Then, the Court will discuss the defenses, raised by the Defendant, in the order they are listed above.

## (1) *Burden of Proof*

 A patent comes to court with a statutory presumption of validity. 35 U.S.C. § 282. Here, the Defendant, as the party seeking to overcome the statutory presumption of validity, has the burden of proving by clear and convincing evidence the facts which demonstrate that the Klonoski patent is invalid. *Pennwalt Corp. v. Akzona, Inc.*, 740 F.2d 1573, 1578 (Fed.Cir. 1984). Defendant argues that because the patent examiner did not have Jacobs, which Defendant asserts is the most relevant prior art, before him, the statutory presumption of validity is destroyed and its burden of proof is not as strict as clear and convincing. The law does not support this argument. Simply stated, "the introduction of prior art more pertinent than that which the examiner considers does not weaken or destroy the statutory presumption of validity." *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734, 738 (Fed.Cir. 1984), citing, *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed.Cir.1983). Hence, Defendant must establish the essential facts of each of its defenses by clear and convincing evidence.

ant's S10, T10, Y10 and F12 spiders, those spi-

## (2) *On Sale*

The on sale defense is set forth in 35 U.S.C. § 102 which provides, in pertinent part:

A person shall be entitled to a patent unless—

. . . . . .

(b) the invention was ... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States. . . .

 In *Jack Winter, Inc. v. Koratron Company, Inc.*, 375 F.Supp. 1, 37 (N.D.Cal. 1974), the court reviewed the on sale defense:

The "on sale" provision of § 102(b) does not require an accomplished sale—even to a single customer before commercial production has begun and even though no actual sale is ever accomplished, *Chromalloy American Corp. v. Alloy Surfaces Co.*, 339 F.Supp. 859, 869 (D.Del.1972)—or by other " 'activity by the inventor or his company in attempting to sell the patented idea' ", *Robbins Company v. Lawrence Manufacturing Company*, 482 F.2d 426, 431 (9 Cir.1973); *Amphenol Corporation v. General Time Corporation*, 397 F.2d 431, 433 (7 Cir.1968); *Tucker Aluminum Products, Inc. v. Grossman*, 312 F.2d 293 (9 Cir. 1963); and *Kraus v. Emhart Corporation* [320 F.Supp. 60, 63 (N.D.Cal.1970)]. In each of these cases, however, the inventor's "activity ... in attempting to sell" involved dealings with the actual trade customers for his product rather than with intermediaries in the patentee's own distribution system. It has been said that sales of commercial samples to the patentee's sales broker, in the absence of actual sales to the trade, do not constitute "sales" within the terms of the statute. *Baker-Cammack Hosiery Mills v. Davis Co.*, 181 F.2d 550, 558 (4 Cir.), *cert. denied,* 340 U.S. 824, 71 S.Ct. 58, 95 L.Ed. 605 (1950). Similarly, it has been held that the shipment of the patented article from one corporate divi-

ders with conic mid-sections on their hubs.

sion to another does not constitute a "sale" with § 102(b). *Union Carbide Corp. v. Filtrol Corp.*, 170 U.S.P.Q. 482, 521 (C.D.Cal.1971).

Moreover, it is not necessary for the product which incorporates the patent to be "on hand" for that product to be on sale.[3] *Barmag Barmer Maschinenfabrik AG v. Murata Machine, Ltd.*, 731 F.2d 831, 836–37 (Fed.Cir.1984); *Timely Products Corp. v. Arron*, 523 F.2d 288, 299–302 (2d Cir.1975).

■ Herein, Plaintiff applied for the Klonoski patent on December 24, 1962; therefore, the critical date is December 24, 1961. The question becomes did the Defendant prove by clear and convincing evidence that a fan incorporating the Klonoski spider was "on sale," under the standards for that term set forth above, before December 24, 1961? The Court's answer to this question is inescapably, yes.

Plaintiff had reduced the Klonoski fan to practice by May, 1961. During that month a prototype of the fan was shown to Plaintiff's sales representatives at its annual sales meeting. By November, 1961, Plaintiff had made the decision to go forward with commercial production of the fan. No further testing or experimentation on the spider was conducted after the summer of 1961. Indeed, the only testing conducted after the patent in suit was reduced to practice was that conducted in July, 1961, in connection with the anticipated patent application, in a futile attempt to demonstrate that the open-ended arms of the spider provided advantages over Jacobs. On November 28, 1961, Plaintiff directed Sales Memo # 319, together with photographs of Klonoski fan, to its sales representatives. Notwithstanding Plaintiff's protestations to the contrary, this Court is of the opinion that there is only one reasonable construction of Sales Memo # 319. It directed Plaintiff's independent sales representatives to get out there and sell the Klonoski fans. Accordingly, the Court finds that there were offers to sell the Klonoski fan

before that critical date of December 24, 1961. Consequently, the patent in suit was on sale before the critical date. This conclusion is buttressed by the Merz letter of November 21, 1962, in which he told Paulding that the first *public use* of the Klonoski fan was "very early in 1961." This was a 100 unit sale to Carrier Corporation built on experimental tooling. Given the fact that customers ordered anywhere from thirty to sixty days before delivery date, logic dictates that an offer to sell was made to Carrier Corporation before the critical date in order for the fans to be in public use by very early in 1962.

■ This Court's conclusion that a product incorporating the patent in suit was on sale more than one year before the application for a patent was filed is not contrary to the teachings of *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613 (Fed.Cir.1985). In *Shatterproof Glass*, the court said, "a bare offer to sell does not ipso facto satisfy the 'on sale' bar. . . ." 758 F.2d at 622. Moreover, the court directed that all surrounding circumstances be considered. *Id.* Herein, there was more than a bare offer to sell before the critical date. Such offers were accompanied by Sales Memo # 319 and photographs of the Klonoski, the patent in suit had long been reduced to practice, and all testing and experimentation was complete. Finally, the Plaintiff had reached its decision to produce and to market the fan and had directed its sales representatives to plug the new design first. Accordingly, the Court concludes that the Klonoski patent is invalid for being on sale more than one year before the patent application was filed.

### (3) *Prior Publication*

The prior publication defense, like the on sale defense, derives from § 102, which provides, in pertinent part:

---

**3.** The "on hand" rule, which was rejected by the Federal Circuit in *Barmeg Barmer,* provides that "a device incorporating the invention must have existed in its ordinary or contemplated usable form, and must have been on hand and ready for delivery more than one year prior to the patent application filing date." *Barmag Barmer,* 731 F.2d at 836.

A person shall be entitled to a patent unless—

. . . . .

(b) the invention was ... described in a printed publication in this or a foreign country ... more than one year prior to the date of the application for patent in the United States....

■ For prior publication to invalidate a patent, three inquiries are required. First, the publication must sufficiently describe the patented device so that one skilled in the art can recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation. *In re Wyer*, 655 F.2d 221, 226 (CCPA 1981); *Tyler Refrigeration Corp. v. Kysor Industrial Corp.*, 553 F.Supp. 279 (D.Del.1982). Second, the prior publication must be sufficiently accessible to the public so that persons concerned with the art, to which the prior publication relates, have an opportunity to inspect the printed publication and digest the information thereon. *Boileau v. Diamond*, 659 F.2d 247 (D.C.Cir.1981); *Tyler Refrigeration Corp.* Third, the prior publication must be accessible, in such manner, in this country or a foreign country, more than one year before an application for patent was filed in the United States.

Defendant argues that the dissemination by Plaintiff of Sales Memo # 319, together with the accompanying photographs, to its independent sales representatives and S. Smith and Sons in England, on November 28, 1961, before the critical date[4] of December 24, 1961, meets the requirement of the prior publication defense.

■ This Court agrees. The Klonoski spider is a visual device; therefore, Sales Memo # 319 and the accompanying photographs are sufficiently descriptive to inform one skilled in the art of air moving equipment of the essentials of the Klonoski spider.[5] Additionally, this publication to

Plaintiff's independent sales representatives and through them to Plaintiff's customers who are the class of persons most concerned with the art to which the memo relates. Additionally, the memo and photographs were disseminated to S. Smith and Sons in England. Finally, this dissemination took place before the critical date of December 24, 1961.

Based on the foregoing, the Court concludes that the Klonoski patent is invalid for violating the prior publication bar contained in § 102.

### (4) *Indefiniteness*

Defendant argues that the Klonoski patent is invalid because it is indefinite in violation of 35 U.S.C. § 112. The Federal Circuit recently elaborated on the definiteness requirement of § 112:

If the claims, read in the light of the specifications, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more.

*Shatterproof v. Glass Corp.*, 758 F.2d at 624, *quoting, Georgia-Pacific v. United States Plywood Corp.*, 258 F.2d 124, 136 (2d Cir.), *cert. denied*, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958).

■ Herein, the weight of the testimony was that the claims of the patent in suit read in light of its specifications and drawings is sufficient to apprise one skilled in the art of the utilization and scope of a Klonoski spider. Indeed, the Court has found such as a matter of fact. Additionally, a finding of indefiniteness would be directly contrary to the Court's finding that Sales Memo # 319 together with the accompanying photographs constituted a prior publication. Accordingly, the Court concludes that the Klonoski patent is not inval-

---

4. Plaintiff filed its patent application on December 24, 1962; hence, the critical date is December 24, 1961.

5. If Sales Memo # 319 and the accompanying photographs were not sufficiently descriptive, the Court would have grave doubts about its conclusion that the patent in suit is not invalid for indefiniteness.

id for being indefinite in contravention of § 112.

### (5) *Obviousness*

 Defendant argues that the Klonoski spider is invalid because of obviousness. The obviousness bar to patentability derives from 35 U.S.C. § 103, which provides:

A patent may not be obtained through the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall ñot be negatived by the manner in which the invention was made.

The well established test for obviousness requires the resolution of three factual inquiries, "the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in pertinent art resolved." *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). *See also, Kwik-Site Corp. v. Clear View Mfg. Co., Inc.*, 758 F.2d 167 (6th Cir.1985). Moreover, secondary considerations, such as commercial success, long felt but unresolved needs and failure of others, must be considered indicia of obviousness or non-obviousness. *Graham*, 383 U.S. at 17–18, 86 S.Ct. at 693–694. Additionally, in considering the teachings of prior art as they relate to obviousness, the Federal Circuit recently commented:

The question of obviousness depends, furthermore, on "not only what the references expressly teach, but what they would collectively suggest to one of ordinary skill in the art." *In re Simon*, 461 F.2d 1387, 1390, 59 CCPA 1140, 174 USPQ 114, 116 (1972).

Furthermore, the Federal Circuit has emphasized that:

In determining patentability, we are guided, as we must be guided, by the statute. A requirement that an invention reflect "synergism" or achieve a "synergistic result," before it may be held patentable appears nowhere in the statute, 35 U.S.C. *The test of obviousness under 35 U.S.C. § 103, as the statute makes plain, is whether the invention as a whole would have been obvious at the time it was made to one of ordinary skill in the art.* References to synergism as a patentability requirement are, therefore, unnecessary and confusing.

*Chore-Time Equipment v. Cumberland Corp.*, 713 F.2d 774, 781 (Fed.Cir.1983) (emphasis supplied).

With the foregoing standards in mind, the Court turns to the question at hand: Did Defendant prove by clear and convincing evidence that the Klonoski spider is obvious? Initially, the Court, in its Findings of Fact, reviewed what it considers to be the relevant prior art. It will not be repeated here. Furthermore, the Court has found that the art required to design the Klonoski spider was that of a third year college engineering student.

There are no material differences between the prior art and the claims at issue. The only difference which the Court has been able to discern is the provision in claim 7 for an open-ended channel. However, Plaintiff's own testing demonstrated that the open-ended channel added nothing to the performance of the spider. Turning to the other claims of Klonoski, the Court finds that none introduces anything that is not taught by prior art.

The patent examiner rejected all original, application claims as unpatentable over Zaiger alone or Zaiger in combination with Posh. Moreover, Merz conceded to Paulding that all of the application claim 1 read on Zaiger. In Finding of Fact ¶ 23, the Court has set out patent claim 1 with those portions of claim 1 which were additions to application claim 1 underlined. Because the patent examiner rejected all of applica-

tion claim 1, the Court deems it necessary to address only the underlined additions.[6]

The addition to clause B of claim 1 that the hub be centrally apertured is not new art. Long before the development of the Klonoski spider, other spiders used holes in the middle of the hub to attach drive shafts. Clause C of claim 1 is nothing more than a restatement application of claim 3 which was rejected by the patent examiner as obvious in light of Zaiger. The additions to clause E of claim 1, that each arm have a "relatively wide" central portion, be "substantially flat throughout a substantial portion of its length" and have "relatively narrow substantially flat" opposite side marginal portions, can be read on Jacobs. The addition to clause F of claim 1 defines nothing different from the smoothly blending and continuous junction between the fan blade arms and the hub section of a Wooden fan or one of Plaintiff's O-series fans. The final clause in claim 1, clause G, adds nothing that is not disclosed by previously marketed spiders, "a plurality of separate sheet metal fan blades," and Jacobs "[the blades are] attached respectively to front surfaces of said marginal portions of said arms...."

Claim 2, which requires the central portion of each arm to extend through at least one-half of its width at the inner end portion, can be read on Jacobs. Claim 3, which requires the width of the central portion of each arm to be substantially in excess of twice the extent of the forward offset of the marginal portions of the arms, can also be read on Jacobs. Claim 4 which requires the inner annular zone to be substantially conical, is not new art in light of the common use of frustoconical hubs on blowers. Claim 5 describes in detail the marginal portions of the Klonoski spider's arms and hub sections. The descriptions of

claim 5 can be read on Jacobs, and if one disregards the blade portions of a Wooden fan and Plaintiff's Series O–fans, they can also be read on Wooden and the Series-O fans. Claim 6 is essentially the same as application claim 6 which was rejected by the patent examiner as being disclosed by Zaiger.

The next step in the obviousness analysis is to assess the secondary considerations. Herein, there was not sufficient evidence from which the Court could find that commercial success, long-felt need and the like render the Klonoski spider non-obvious.

■ Thus, all but one claim of the patent in suit is disclosed by prior art, and the secondary considerations do not counsel against a conclusion of obviousness. Moreover, the level of skill required to develop a spider is minimal. Therefore, based upon the foregoing, the Court concludes that the patent in suit is invalid for obviousness.

*(6) Fraud on the Patent and Trademark Office.*

■ Defendant argues for a number of reasons that the patent in suit is invalid because Plaintiff committed fraud on the Patent and Trademark Office. The only charge of fraud which the Court considers worthy of lengthy discussion is that Plaintiff committed such a fraud by not revealing its knowledge of Jacobs to the patent examiner.[7]

■ Failure to call material, relevant prior art to the attention of the patent examiner will support a defense of fraud. *Skil Corp. v. Lucerne Product, Inc.*, 489 F.Supp. 1129, 1135 (N.D.Ohio 1980), *aff'd*, 684 F.2d 346 (6th Cir.), *cert. denied*, 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982); *Buzzelli v. Minnesota Mining and Manufacturing Co.*, 521 F.2d 1162 (6th

6. Changes which do not affect the substance of claim 1, in other words, which merely clarify the language, will not be discussed.

7. The Court rejects Defendant's contentions that Plaintiff's failure to disclose Wooden and other pertinent prior art to the patent examiner constituted fraud because the Court is of the opinion that such prior art is not material. Further-

more, the Court rejects Defendant's contention that Plaintiff committed fraud by not investigating the facts surrounding its pre-December 24, 1961 offers to sell and informing the Patent and Trademark Office of same. There was no intent to defraud in this regard. At the worst, Plaintiff was negligent.

Cir.1975). In order for the defense to be sustained, the following elements must be shown:

(1) a failure to call attention to relevant, material prior art;

(2) Specific intent to defraud.

*See, e.g., Skil Corp., supra; Kearney & Trecker Corp. v. Cincinnati Milacron*, 562 F.2d 365 (6th Cir.1977); *Norton v. Curtiss*, 433 F.2d 779 (CCPA 1970). *See also, Hycor Corp. v. Schlueter Corp.*, 740 F.2d 1529, 1538 (Fed.Cir.1984) ("A breach of duty of candor owed to the PTO, that prevents the grant of a patent or causes it to be held invalid or unenforceable, occurs when material information is misrepresented or withheld, and such misrepresentation or withholding is intentional or accompanied by gross negligence or bad faith."). Additionally, in a case where the claim of fraud involves the withholding of relevant prior art from the patent examiner, to be material, the nondisclosed prior art is material if the application would have been rejected but for the non-disclosure. *Skil Corp. v. Lucerne Products, Inc.*, 684 F.2d 346, 350 (6th Cir.), *cert. denied*, 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982), *citing, Deere & Co. v. Hesston Corp.*, 593 F.2d 956, 960 (10th Cir.), *cert. denied*, 444 U.S. 838, 100 S.Ct. 75, 62 L.Ed.2d 49 (1979) and *Norton v. Curtiss*, 433 F.2d at 795.

Applying these standards to the evidence herein, without question Plaintiff did not disclose Jacobs to the patent examiner. Thus, the questions are, was Jacobs material, and if so, did Plaintiff act with intent to defraud by withholding it from the patent examiner?

 The Court has found, as a matter of fact, that the Plaintiff's application would have been rejected if the patent examiner had been aware of Jacobs. Defendant's expert witness so testified. However, the most telling evidence in this regard are the words and actions of Plaintiff and its chief engineer. Merz expressed grave doubts about the advisability of applying for a utility patent for the Klonoski spider because of Jacobs. He even had tests conducted in what turned out to be a futile effort to demonstrate the novelty of the Klonoski fan over Jacobs. In arguing that the amended claims were patentable over Zaiger, Plaintiff stressed as critical the relatively wide center portion of the arm and its relatively narrow marginal portion. These claims are directly readable on Jacobs. Moreover, a visual examination of the two types of fans conclusively demonstrates the materiality of Jacobs as prior art.

 Next, did Plaintiff act with requisite intent to defraud? Intent, like any other fact, can be proved with circumstantial evidence. Herein, the circumstantial evidence unquestionably supports the Court's factual finding that the Plaintiff acted with the intent to defraud the Patent and Trademark Office when Merz and Paulding failed to disclose Jacobs. As stated above, Merz was fully aware of the pertinence of Jacobs as prior art. This awareness went so far order tests on the open channel of a Klonoski spider to distinguish it from Jacobs. Nevertheless, after the Plaintiff's original application was rejected, Merz and Paulding met with the patent examiner in an effort, which proved to be successful, to persuade the patent examiner of the patentability of the amended claims over Zaiger. At no time did either Merz or Paulding inform the examiner of Jacobs.

Based on the foregoing, the Court concludes that the Klonoski patent is invalid for fraud on the Patent and Trademark Office.

### (7) *Foreign Filing*

Defendant argues that the Klonoski patent is invalid under 35 U.S.C. § 185 [8] be-

---

8. Section 185 provides:

Notwithstanding any other provisions of law any person, and his successors, assigns, or legal representatives, shall not receive a United States patent for an invention if that person, or his successors, assigns, or legal representatives shall, without procuring the license prescribed in section 184 of this title, have made, or consented to or assigned another's making, application in a foreign country for a

**1094**

cause Plaintiff filed, caused to be filed or authorized the filing of an application for patent by S. Smith & Sons in contravention of 35 U.S.C. § 184.[9]

Section 184 prohibits the filing of a foreign application, until six months after an application is filed in the United States, unless a license is first obtained from the Commissioner to do so. Without question, Plaintiff violated § 184. The circumstances surrounding this violation are set forth in the Court's Findings of Fact ¶¶ 19–21. However, § 184 also authorizes the issuance of a retroactive license upon a finding of inadvertence. This authority to grant a retroactive license does not terminate with the issuance of the United States patent. *Minnesota Mining and Manufacturing v. Norton*, 366 F.2d 238 (6th Cir. 1966), *cert. denied*, 385 U.S. 1005, 87 S.Ct. 711, 17 L.Ed.2d 544 (1967). Herein, Plaintiff applied for and received a retroactive license after this action was filed.

The parties argue vigorously over this Court's "standard of review" of a finding of inadvertence by the Patent and Trademark Office. There is little of authority on the question; however, courts have held that they may re-examine the finding of inadvertence. *See, e.g., Iron Ore Co. v. Dow Chemical Co.*, 177 USPQ 34, 54–55 (D.Utah 1972), *aff'd*, 500 F.2d 189 (10th Cir.1974); *Minnesota Mining and Manufacturing Co. v. Norton*, 153 USPQ 449 (N.D.Ohio 1967), *on remand from*, 366

F.2d 238 (6th Cir.1966). This Court is convinced that a defense predicated on §§ 184 and 185 is like any other defense. The proponent of the defense has the burden of proving by clear and convincing evidence the facts necessary to constitute the defense. Hence, Defendant has the burden of proving with clear and convincing evidence that Plaintiff did not act inadvertently when the S. Smith and Sons application was filed without a license. Additionally, the Court rejects Plaintiff's contention that this Court may reach a different conclusion on the question of inadvertence than that reached by the Patent and Trademark Office only if there is evidence before it in addition to that considered by that office. *Cf. Mead Digital Systems, Inc. v. A.B. Dick Co.*, 723 F.2d 455 (6th Cir.1983) (holding that a district may invalidate a patent under § 103, for obviousness, using the same prior art that the Patent and Trademark Office considered).[10]

Based upon the evidence before it, the Court has found as a matter of fact that Merz acted inadvertently. Hence, Defendant has not met its burden of proof, and the Court concludes that the Klonoski patent is not invalid under §§ 184 and 185.

(B) *Infringement.*

Because the Court has concluded for a number of reasons that the patent in suit is invalid, the question of infringement is seemingly moot. However, in the interests

---

patent or registration of a utility model, industrial design, or model in respect of the invention. A United States patent issued to such person, his successors, assigns, or legal representatives shall be invalid.

9. Section 184 provides:

Except when authorized by a license obtained from the Commissioner a person shall not file or cause or authorize to be filed in any foreign country prior to six months after filing in the United States an application for patent or for the registration of a utility model, industrial design, or model in respect of an invention made in this country. A license shall not be granted with respect to an invention subject to an order issued by the Commissioner pursuant to section 181 of this title without the concurrence of the head of the depart-

ments and the chief officers of the agencies who caused the order to be issued. The license may be granted retroactively where an application has been inadvertently filed abroad and the application does not disclose an invention within the scope of section 181 of this title.

The term "application" when used in this chapter includes applications and any modifications, amendments, or supplements thereto, or divisions thereof.

10. Common sense would dictate that if a court may invalidate a patent with no additional evidence in an area of Patent Office expertise such as obviousness under § 103, it may do the same in an area where a court is as expert in resolving a factual question, as is the Patent Office, to wit: did someone act inadvertently.

of judicial economy, the Court will discuss the question of whether Defendant's Preferred Line Propeller infringes the patent in suit. Thus, should appellate review be sought in this case, the Federal Circuit will be able to pass on all of this Court's findings and conclusions, if necessary. To resolve the question of infringement, the Court will first review the legal standards that govern such question. Then, the Court will apply those standards to the evidence before it.

■ Because Plaintiff filed an amended patent application, the question of infringement herein involves the collision of the doctrine of equivalents and of file wrapper estoppel. The doctrine of equivalents is a recognition by courts that patent infringers seldom literally copy a patented product. Recently, the Federal Circuit summarized the doctrine:

> The doctrine of equivalents comes into play only when actual literal infringement is not present. Under the doctrine of equivalents, an accused product that does not literally infringe a structural claim may yet be found an infringement "if it performs substantially the same way to obtain the same result" as the claimed product or process. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) (quoting from *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147). The doctrine is judicially devised to do equity. "Courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing," *id*, 339 U.S. at 607, 70 S.Ct. at 856, and again, "The essence of the doctrine is that one may not practice a fraud on a patent," *id*. at 608, 70 S.Ct. at 856.

*Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed.Cir.1983).

■ The doctrine of file wrapper estoppel operates to narrow claims of infringement after an application has been amended, particularly when such amendments are necessary to overcome prior art. In *Hughes Aircraft Co.*, the court explained:

> The doctrine of prosecution history estoppel [file wrapper estoppel] precludes a patent owner from obtaining a claim construction that would resurrect subject matter surrendered during prosecution of his patent application. The estoppel applies to claim amendments to overcome rejections based on prior art. *Dwyer v. United States*, [174 Ct.Cl. 1064] 357 F.2d 978, 984,m 149 USPQ 133, 138 (Ct.Cl. 1966), and to arguments submitted to obtain the patent, *Coleco Industries, Inc. v. ITC*, 573 F.2d 1247, 1257, 197 USPQ 472, 480 (Cust. & Pat.App.1978).

717 F.2d at 1362.

■ Furthermore, in *Hughes Aircraft Co.*, the court addressed the relationship between the doctrines of equivalents and of file wrapper estoppel:

> Some courts have expressed the view that virtually any amendment of the claims creates a "file wrapper estoppel" effective to bar all resort to the doctrine of equivalents, and to confine patentee "strictly to the letter of the limited claims granted." *Nationwide Chemical Corp. v. Wright*, 584 F.2d 714, 718–19 (5th Cir.1978); *Ekco Products Co. v. Chicago Metallic Manufacturing Co.*, 347 F.2d 453, 455 (7th Cir.1965). We, as has the Supreme Court, reject that view as a wooden application of estoppel, negating entirely the doctrine of equivalents and limiting determination of the infringement issue to consideration of *literal* infringement alone. That view, as above indicated, fails to recognize that the doctrine of equivalents is unnecessary when literal infringement is present and is contrary to the guidance provided by the Supreme Court in *Graver, supra*. Amendment of claims is a common practice in prosecution of patent applications. No reason or warrant exists for limiting application of the doctrine of equivalents to those comparatively few claims allowed exactly as originally filed and never amended. Amendments may be of

different types and may serve different functions. Depending on the nature and purpose of an amendment, it may have a limiting effect within a spectrum ranging from great to small to zero. The effect may or may not be fatal to application of a range of equivalents broad enough to encompass a particular accused product. It is not fatal to application of the doctrine itself.

717 F.2d at 1362–63 (emphasis in the original). Finally, the Court notes that the Plaintiff has the burden of proving infringement by a preponderance of the evidence. *Id.* at 1361.

With these standards in mind, the Court turns to the evidence before it. The Court has found, as a matter of fact, that the arms of Defendant's S10, T10, Y10 and F12 model Preferred Line Propellers does not have relatively wide central portions and relatively narrow opposite side marginal portions. Moreover, the fan blades on Defendant's accused fans are not attached to the spider at the relatively narrow marginal portions. Rather, they are attached to large triangular shaped marginal portions.

These two distinctions between Plaintiff's and Defendant's spiders are important because each involves a portion of the amended claim by which Plaintiff sought to distinguish the Klonoski fan from prior art. Of particular importance is the relatively wide/relatively narrow relationship of the central and marginal portions. Plaintiff referred to this relationship as critical when arguing that the amended claims were patentable over Zaiger. Under these circumstances, the Court concludes that file wrapper estoppel prevents Plaintiff from claiming infringement by a fan that does not also have the relatively wide/relatively narrow relationship. The Court reaches this conclusion because Plaintiff surrendered its claim to a patent which does not have such a relationship, when it amended its application to include such a claim and argued that the Klonoski spider was patentable over Zaiger because Klonoski has the relatively wide/relatively narrow relationship where-

as Zaiger does not. Indeed, the essence of the file wrapper estopel doctrine is that one may not resurrect claims (herein a spider without a relatively wide/relatively narrow relationship) which are surrendered to overcome rejections based on prior art. *Hughes Aircraft Co.*, 717 F.2d at 1362. Because Defendant's accused fans do not have a relatively wide/relatively narrow relationship, they do not infringe the patent in suit.

(C) *Attorney's Fees.*

Defendant requests an award of attorney fees as provided for in 35 U.S.C. § 285. Section 285 reads: "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." Without question, Defendant is the prevailing party herein. Thus, the question becomes, is this an "exceptional case." In *Campbell v. Spectrum Automation Co.*, 601 F.2d 246, 251 (6th Cir.1979), the court discussed the exceptional case requirement:

Section 285 permits an award of attorneys' fees in patent cases to the prevailing party where the circumstances of the case are "exceptional." This court has previously held exceptional circumstances to include conduct that is fraudulent, malicious, in bad faith. *Hoge Warren Zimmerman Co. v. Nourse & Co.*, 293 F.2d 779 (6th Cir.1961), and unfair, inequitable, unconscionable, or similar conduct. *Deyerle v. Wright Manufacturing Company*, 496 F.2d 45 (6th Cir.1974). *See also, Eltra Corporation v. Basic Incorporated*, 599 F.2d 745, No. 77–3364 (6th Cir. May 21, 1979).

Herein, the only conduct which approaches bad faith, or conduct which is fraudulent, malicious, inequitable or unfair, is Plaintiff's fraud upon the Patent and Trademark Office. Neither the three other grounds of invalidity that the Court has found on sale, prior publication and obviousness, nor the fact that the Court has not found infringement by Defendant places this case in the exceptional case category. The questions of fact were close, particularly considering the heavy burden placed

upon Defendant to prove invalidity with clear and convincing evidence. Moreover, in many instances, ultimately questions of fact, such as those raised by the "on sale" defense, were proved circumstantially from events occurring nearly twenty years before the suit was initiated. This, in the Court's opinion, negates any inference that Plaintiff conducted this litigation fraudulently, maliciously or with bad faith.

Fraud on the Patent and Trademark Office is a different, closer question. It would seem that fraud on the Patent and Trademark Office would necessitate a finding of fraudulent conduct on the part of Plaintiff. However, the Sixth Circuit has said: "attorney fees may be denied even though there has been a lack of candor on the part of the patentee in his dealings with the Patent and Trademark Office." *Union Carbide Corp. v. Borg-Warner Corp.*, 550 F.2d 355, 363 (6th Cir.1977), *citing, Indiana General Corp. v. Krystinel Corp.*, 421 F.2d 1023 (2d Cir.), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970).

Herein, notwithstanding its finding of fraud on the Patent and Trademark Office, this Court concludes that this is *not* an exceptional case. The events which led to this Court's finding of fraud occurred nearly twenty years before the onset of this litigation. Moreover, Plaintiff conducted this litigation fairly and expeditiously and has tried to minimize litigation costs to the parties and to conserve judicial resources. Additionally, when it became apparent that certain models of Defendant's Preferred Line Propellers could not conceivably infringe the patent in suit, Plaintiff dropped those models from its claim of infringement.

In short, this is not "vexatious or harassing litigation, really smelling of bad faith." *Shatterproof Glass Corp. v. Guardian Glass Co.*, 322 F.Supp. 854, 871 (E.D.Mich. 1970). Accordingly, this Court declines to exercise its discretion and to award attorney fees to Defendant under § 285.

## III. CONCLUSIONS OF LAW

(1) This Court has subject matter jurisdiction over this cause pursuant to 28 U.S.C. § 1338(a).

(2) Defendant has proved, by clear and convincing evidence, the facts necessary to show that the patent in suit was on sale more than one year before the application for patent was filed; therefore, the patent in suit is invalid. 35 U.S.C. § 102.

(3) Defendant has proved, by clear and convincing evidence, the facts necessary to prove that the patent in suit was described in a publication more than one year before the application for patent was filed; therefore, the patent in suit is invalid. 25 U.S.C. § 102.

(4) The patent in suit is invalid because at the time it was made, it was obvious to one skilled in the art. 35 U.S.C. § 103.

(5) The patent in suit is invalid for fraud on the Patent and Trademark Office.

(6) The patent in suit is not invalid for violating 35 U.S.C. §§ 184 and 185, with reference to foreign filing.

(7) The patent in suit is not invalid for indefiniteness.

(8) Defendant's accused fans do not infringe the patent in suit.

(9) This is not an "exceptional case" and, as a consequence, Defendant is not entitled to attorney's fees.

## IV. FURTHER PROCEDURES

The Court has scheduled a telephone conference call at 4:30 p.m. on Tuesday, September 24, 1985, in order to set a trial date, and other pertinent dates, for the resolution of Defendant's counterclaim. The Court is aware of the fact that discovery has not begun upon the issues set forth in the Defendant's counterclaim and that this case has been pending for an unconscionably long period of time. Before the parties become too involved in discovery, it is the hope of the Court that all claims can now be settled without further expenditure of funds by the parties.