**R.E. PHELON COMPANY, INC., Plaintiff,**

v.

**WABASH, INC., Defendant.**

**No. S 79–9.**

United States District Court, N.D. Indiana, South Bend Division.

May 30, 1986.

As Amended July 9, 1986.

James D. Hall, South Bend, Ind., John J. Dempsey, Springfield, Mass., Jerald A. Jacover, Chicago, Ill., for plaintiff.

Walther E. Wyss, Chicago, Ill., John J. Lorber, Wendell W. Walsh, South Bend, Ind., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

The jurisdiction of this case is not disputed; it is based on 35 U.S.C. § 1 *et seq.* and 28 U.S.C. §§ 1338 and 1400. The parties agreed to bifurcate the issues of liability and damages for the purposes of trial. This opinion addresses the liability issues only. There are three patents at issue in this litigation: United States Patent No. Re. 31,837 ('837), United States Patent No. 4,228,780 ('780), and United States Patent No. 4,333,442 ('442).

This case comes before the Court after several procedural steps. The case was originally filed on January 16, 1979. The complaint alleged infringement, by the defendant's products, of United States Patent No. 4,036,201 ('201). The defendant, by answer, challenged the validity of the plaintiff's patent and asserted counterclaims based on two additional patents: United States Patent No. 4,228,780 ('780) and United States Patent No. 4,333,442 ('442). After this complaint was filed an interference was filed to determine the seniority rights between the Burson '201 and Carmichael No. 4,056,088 ('088) patents. Burson and Carmichael are the inventors of the respective patents at issue in the interference. Subsequent to the filing of the interference, the parties requested and were granted a stay of proceedings in the infringement action in this court. During the interference proceedings the plaintiff applied for a reissue patent. The reissue application retained claims 1–5 of the '201 patent and added claims 6–10. The application

was approved and United States Patent No. Re. 31,837 issued on Feb. 26, 1985. The plaintiff amended the complaint to allege infringement of the '837 patent. The Patent and Trademark Office Board's decision, which granted Carmichael senior rights, was appealed and the United States Court of Appeals for the Federal Circuit reversed the Board's decision and granted seniority rights to the Burson '201, now the '837, patent. Following the decision of the United States Court of Appeals for the Federal Circuit the stay of proceedings in the infringement action was set aside, and this case went forward. This case was tried by this court without a jury over eight trial days. This court also heard final arguments on March 28, 1986 after the issues raised at trial had been fully briefed. Due to the complexity of the issues in this case this court chose not to adhere strictly to the Seventh Circuit Judicial Council Resolution of October 4, 1984 requiring submission of post-trial briefs within ten (10) days of the bench trial. The following represents the Findings of Facts and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

The Federal Circuit instructs that patent cases must be analyzed in the "real world." The real world of this litigation is the competitive area of ignition systems, specifically capacitive discharge ignition (CDI) systems, for small gasoline engines. The fierceness of the competitive atmosphere was so strong that "one would cut your throat for a dollar." Unfortunately this competition was transmuted into adolescent hide and seek, and quarrelsome conduct between the attorneys for both parties. This case has been fraught with discovery disputes and inappropriate activity by both sides. The depositions, filings, briefs and trial transcript are replete with accusatory and contentious language which was directed at the attorneys' conduct and did absolutely nothing to forward any legal issue of this case. Although the court encourages strong advocacy, the behavior of the attorneys in this case degenerated beyond the realm of good advocacy. That behavior was anything but helpful to this court in performing its proper functions here.

## II.

### *The '837 Patent*

This case began in the real world before 1974. The ignition system industry was searching for an inexpensive substitute for the breaker point magneto ignition system. Although as early as 1969, the Piteo patent, United States Patent No. 3,447,521 ('521), disclosed a breakerless ignition system, that system was not cost competitive in the marketplace. Several breakerless ignition systems were developed, including some developed by the plaintiff, between 1969 and 1974.[1] There were several characteristics which were shared by the early systems: (1) the charging, triggering or auxiliary coils were not placed on the same leg of a multilegged ferromagnetic core as the triggering mechanism and primary and secondary coil; (2) they were not cost competitive; and (3) the bulk of the systems limited utilization in the marketplace of small gasoline engines.

CDIs work in the following manner. A magnet is fixed on a flywheel which rotates, in synchronism with the shaft of an internal combustion engine, past a ferromagnetic core which may be comprised of multiple core legs. Coils which are capable of generating energy are wrapped around the core legs. As the magnet, on the flywheel, passes the core legs a magnetic flux is induced and a voltage is generated in the coils.[2] The circuit is structured so that the voltage induced in the charging coil is transferred to a capacitor where that ener-

---

1. United States Patent Nos.:

| Burson | 3,464,397 |
|--------|-----------|
| Burson | 3,554,179 |
| Burson | 3,809,040 |
| Burson | 3,911,887 |
| Burson | 3,955,549 |

2. Voltage is comprised of both energy and current. The words voltage and energy are used interchangably, and unless otherwise specified are not intended to connote any specialized meaning.

gy is stored. That energy is held in the capacitor until the "gate", of the silicon controlled rectifier (SCR), is opened to permit the energy to flow through the transformer, consisting of primary and secondary coils, to a spark plug in most cases. The SCR is triggered (opened) when energy induced in either the charging coil or the primary coil reaches a certain voltage and flows to the gate.

On January 8, 1974, Mr. Bob Burson challenged the prevailing thinking of those skilled in the art of CDI systems. He placed the charging coil on the same ferromagnetic core leg as the primary and secondary coil. Even Mr. Burson's peers at Phelon were skeptical due to the perceived possibility that such placement would interfere with the proper triggering of the gate. On or about January 8, 1974, Mr. Burson tested a CDI with a charge coil, primary coil and secondary coil mounted on the same leg of a multilegged ferromagnetic core. These tests indicated that this system was possible. At the same time Mr. Burson reduced the device to practice. Mr. Burson disclosed his discovery to Mr. Dale Phelon who ran some tests on the disclosed CDI. Mr. Dale Phelon was "excited" about this discovery. A few weeks after the initial tests, during a routine sales call to Homelite, a customer of Phelon, Inc., Mr. Dale Phelon, then sales manager, later president of Phelon, Inc., discussed, in general terms, the ignition system which Mr. Burson had recently developed. Mr. Phelon testified that he did not offer to sell Homelite the new system. Homelite was utilizing a CDI system with advance timing at the time and said they were not interested in a CDI with fixed timing.

Mr. Donald K. Huber, an attorney, was contacted by the plaintiff and he began the process of applying for a patent. Mr. Huber drafted a patent application from the disclosure which the plaintiff gave to him. In addition, he directed or performed several searches of the Patent Office files for pertinent prior art. After some discussions with the plaintiff's representatives and Mr. Burson, the draft application was approved and filed with the patent office on April 29, 1975. In the certified file history of Mr. Burson's United States Patent No. 4,036,-201 ('201)[3] there was no indication that Mr. Burson disclosed any of his own patents on ignition systems as prior art. On October 31, 1975, the patent examiner rejected claims 1–14, on the basis of prior art: Penn, Hohne, Piteo, Just, Bodig, Struber and Swift. The notice of rejection was mailed on November 26, 1975.

The Piteo patent No. 3,484,677 disclosed an inductive discharge system in which the primary, secondary and "control" coil were located on the same leg of a multilegged ferromagnetic core. An inductive system functions differently than a capacitive discharge system. In the inductive type, like Piteo, the energy generated in the coils is transferred directly through the transformer to the spark plug. However, the capacitive system stores the energy in a capacitor until a trigger signal opens the pathway through the transformer to the spark plug. The other prior art cited by the examiner were systems which did not teach the critical placement of the charging, primary and secondary coils on the same leg of a multilegged ferromagnetic core.

On July 9, 1975, Mr. Huber discovered the Carlsson, United States Patent No. 3,828,754 ('754), which had been issued on August 13, 1974. The '754 patent disclosed all the coils on one multilegged ferromagnetic core, but the charging, primary and secondary coils were still segregated on separate core legs. The '754 patent was assigned to a Swedish Corporation. Mr. Huber sent a copy of the '754 patent to Mr. Burson for his persual and comments; after some discussion it was decided that the '754 patent was not material, and it was not disclosed to the patent office. Mr. Huber did request a Swedish firm to do a patent search for prior art relevant to the '754 patent. No additional material

3. Although the original patent was surrendered and has no independent legal significance a discussion of the '201 patent's history is required to evaluate the issues of this case.

information was discovered from that search.

Mr. Huber included a new claim 15 when he filed a response to the official action dated November 26, 1975. The new claim 15 disclosed:

15. A breakerless condenser discharge ignition system for an internal combusion engine, said ignition system comprising: a permanent magnet means rotated about a circular path in synchronism with the operation of said engine, a core of ferromagnetic material mounted adjacent said path of said magnet means and having one portion through which a changing amount of flux from said magnet means passes each time said magnet means moves past said core, said portion being further one such that at any given time said flux from said magnet means is substantially the same at all points along the length thereof so that all windings received thereon are subject to the same changes of flux from said magnet means, first, second and third windings received on said one core portion, a capacitor, a charging circuit connecting said capacitor with said first winding for charging said capacitor from the voltage induced in said first winding, a discharging circuit connecting said capacitor with said second winding for discharging said capacitor through said second winding, said discharging circuit including a normally nonconducting electronic switch which prevents discharge of said capacitor through said second winding until switched to a conducting state, said electronic switch have a control terminal and switching to a conductive state when a control signal is applied to said control terminal, means coupling one of said first and second windings with said control terminal for applying a control signal to said control terminal in response to the voltage induced in said one of said first and second windings, and a spark plug connected in series with said third winding.—

The amended claims 1–14 and the new claim 15 were rejected by the examiner on April 7, 1976 on the basis of the Carmichael *et al*, United States Patent No. 3,941,111 ('111). Notice of that rejection was mailed to Mr. Huber on May 6, 1976. Mr. Huber filed a request for an extension of time on July 27, 1976; the Patent and Trademark Office granted the request and gave the applicant until October 6, 1976, to file a response to the last rejection. After July 27, 1976, but before September, 1976, Mr. Dempsey became the attorney for the plaintiff, and he continued the prosecution of the Burson patent application. Mr. Dempsey cancelled the prior claims and added some rewritten claims on October 6, 1976. The new amendments added and changed some language in the specifications. The amendments disclosed a CDI system which was comprised of a charging and primary coil which were in-phase and each generated a wave form with half-cycles of opposite polarity. Significantly, language was added to what became claim 1 which disclosed a CDI system in which the charging and primary winding were "simultaneously at the same polarity." This addition addressed one of the problems the patent examiner raised when he cited the '111 patent. In addition to the language changes, Figure 7 of the original drawings was changed. The change moved a dot, which was used to indicate polarity, from the end of the primary winding which was close to ground to the opposite end of the primary winding. (Appendix A) The change in Figure 7 is consistent with the language which was added to claim 1, and the language of the original specification.

Figure 8 is a pictorial representation of the voltage wave forms generated by the voltage of the charging and primary coils. (Appendix B) In addition, that figure illustrates the relationship between the voltage changes and the triggering of the SCR. The disclosure expressed in the specifications, claims, and Figure 7 are not consistent with the pictorial representation in Figure 8.

The third attempt to obtain a patent on Mr. Burson's CDI system was successful. The original patent issued on July 19, 1977

as United States Patent No. 4,036,201 ('201). The inventor was Mr. Bob O. Burson and the assignee was R.E. Phelon Company, Inc., East Longmedow, Mass.[4]

The utilization of this CDI system did not immediately skyrocket, but within a relatively short time the marketplace replaced the breaker point magneto and inductive systems with the CDI system. Within two years (1977–1979) the number of CDI units sold by the plaintiff grew from 231,192 to 1,837,376, and the price per unit decreased from four dollars and six cents ($4.06) to as low as two dollars and seventy cents ($2.70).

The defendant was a licensee under the '111 patent which was assigned to Syncro Corporation. The defendant manufactured an evolutionary series of CDI systems which the defendant refers to as Generation I, II, and III CDI Systems. The '111 patent disclosed a CDI system which included the charging coil on one leg of a multilegged ferromagnetic core and the primary and secondary coils on another leg of the multilegged ferromagnetic core. Triggering of the SCR gate was to be accomplished by utilizing a portion of the first half cycle of the varying flux induced in the charging coil. This CDI utilized the charging coil both to charge the capacitor and to trigger the SCR. The triggering was controlled by utilizing two capacitors of different capacitance; by changing such capacitance the triggering circuit could retard or advance the spark relative to engine operation. The defendant's Generation I CDI was a modification of the '111 patent under which it was licensed. The modified version was comprised of a system in which the charging, primary and secondary coils were couched on the same leg of a multilegged ferromagnetic core. Mr. William Walters testified at trial that Figure 2 of plaintiff's exhibit 62 was a schematic explanation of a Generation I

CDI. (Appendix C) The description of how Figure 2, Generation I, functioned illustrates that the primary coil triggered the SCR gate; that permitted the energy stored in the capacitor to be released and to flow through the transformer to the sparking mechanism. Further, the charging and primary coils were in-phase and each coil generated a wave form with half-cycles of opposite polarity.

Prior to May 15, 1978 the plaintiff discovered that the defendants were manufacturing a device which the plaintiff believed infringed the '201 patent. On May 15, 1978 the plaintiff's attorney wrote to the defendant and alleged the infringement. The defendant through counsel requested some time to investigate the plaintiff's allegations. On August 28, 1978, the defendant's attorney, wrote to the plaintiff's attorney and stated that an interference was going to be filed challenging the '201 patent with the '088 patent. This activity was subsequent to Mr. Carmichael receiving a copy of the '201 patent. Mr. Carmichael received a copy of the '201 patent from the plaintiff. Mr. Dale Phelon sent Mr. Carmichael a copy of the '201 patent after Mr. Carmichael ordered some coils which included the charging, primary and secondary coils on the same leg of a multilegged ferromagnetic core; since this configuration was extremely similar to the '201 patent.[5]

An interference was filed in the Patent and Trademark Office (PTO), Board of Patent Examiners, between Carmichael '088 and Burson '201. The Board decided that Carmichael had senior rights between the two patents at issue. Mr. Burson appealed the Board's decision to the Court of Appeals for the Federal Circuit. Judge Markey writing for the panel reversed the decision of the Board and awarded senior rights to the '201 patent. *Burson v. Car-*

4. The references cited by the patent examiner were United States Patent Nos.:

Penn 3,032,687  Struber *et al* 3,704,701
Piteo 3,484,677  Swift *et al* 3,722,488
Hohne *et al* 3,500,809  Just *et al* 3,851,636
Bodig *et al* 3,703,889  Carmichael *et al* 3,941,111

5. Syncro Corporation did not manufacture the coils which the company installed in the igni-

*michael,* 731 F.2d 849 (Fed.Cir.1984). That decision is the controlling precedent for any issue relevant to senior rights between the '201 and the '088 patents.

The plaintiff filed this infringement case shortly before the interference was filed. The interference delayed resolution of the issues in this case until the interference was decided. During the prosecution of the interference the examiner asked Burson's attorney to tell him, what, if any, defenses the defendant had raised by answer in this patent infringement case. During the prosecution of the reissue application in an official action dated July 3, 1980, the examiner stated that the "Applicant is required to advise the Office of the defenses raised in the litigation so that the same may be considered insofar as relevant to this reissue application." In a response dated July 21, 1980, to the official action, Mr. Dempsey advised the examiner that "... at this time, there has been no answer filed by the Defendant." However, the answer had been filed and mailed on March 13, 1979. Mr. Dempsey, in his deposition, admitted he probably received a copy of answer a few days after March 13, 1979. Therefore, the statement made to the examiner was clearly incorrect. Mr. Dempsey stated he "must have been thinking in terms of the fact that there was a stay in the action and there was no proceedings, so it was an oversight."

While the interference was proceeding the plaintiff filed an application for a reissue patent. One of the justifications given, under oath, by Burson, was to claim the totality of his invention. A portion of what Burson believes is the totality of his invention included this language:

9. In a capacitor discharge system for internal combustion engines as set forth in claim 6 wherein said charge coil and transformer coils are essentially the only voltage generating coils employed in said system whereby capacitor charging, the electronic switch means triggering and the transformer ignition functions are all performed by said charging coil and transformer coil in the absence of a separate trigger coil.

The reissue patent was applied for on June 25, 1979. Burson disclosed prior art of: Strelow, Cavil, Beuk, Struber, Carlsson, Just, Motobacane (French), Forman and Sohner. The examiner rejected claims 1–10 on June 30, 1980; that rejection was mailed on July 3, 1980, and was based on Anderson *et al* in view of Hohne *et al* and Piteo. The prosecution of the reissue patent was stayed on December 20, 1979, pending a final determination of priority in the interference proceedings. The applicant requested that the prosecution go forward concurrently with the interference. On July 31, 1980, Mr. Dempsey filed another response. That response inserted some language but the thrust of the response was to distinguish the prior art which the examiner cited and to requested reconsideration. Mr. Dempsey's arguments were successful and the examiner allowed claims 1–10 of the reissue patent on July 5, 1984. The reissue patent is United States Patent No. Re. 31,837; the inventor of that patent is still Burson and it is also assigned to R.E. Phelon, Inc., East Longmedow, Mass.

There were several steps in the eventual disclosure and offer for sale of a product under the '837 patent. On January 8, 1974, the invention was conceived and by January 10, 1974 the invention had been reduced to practice. Mr. Dale Phelon was cognizant of the invention shortly after its conception. Mr. Phelon personally participated in testing the new CDI. A few weeks after those tests, Mr. Phelon was visiting Homelite, a customer who utilized the plaintiff's advance timing ignition system, and discussed in general terms a recently conceived fixed ignition CDI system. The customer did not express an interest in the development of a fixed timing CDI system. Consequently, this new CDI was not "put into formal action" until a memo-

tion systems which it manufactured. Instead Syncro Corporation ordered those coils from

manufacturers such as the plaintiff and defendant.

randum from Mr. Day, President of Phelon, Inc., dated September 12, 1974, announced that Lauson was looking for a low cost CDI.

### The '780 Patent

Mr. Ronald Kiess worked for Wabash, Inc., the defendant, from 1974–1978. During his employment Mr. Kiess developed and tested a CDI system which allegedly became the defendant's Generation III CDI, and is allegedly the model currently being produced and sold by the defendant. On February 22, 1979, a patent application disclosing Mr. Kiess' invention was filed.[6] Wabash, Inc., Wabash, Indiana, is the assignee of the patent. The disclosure filed with the application included pertinent prior art.[7] The examiner rejected claims 1–14 originally, but after amendments were filed claims 1–16 were accepted and United States Patent No. 4,228,780 issued on October 21, 1980.

The defendant asserts a counterclaim against the plaintiff which alleges that the plaintiff's model No. 10885–05 CDI infringes claim 12 of the Kiess Patent. Claim 12 of the Kiess patent '780 reads:

> 12. A capacitor discharge ignition system for use with a rotating magnet in synchronism with the operation of an engine, said capacitor discharge ignition system comprising:
>
> > a core of ferromagnetic material positioned adjacent the path of the rotating permanent magnet;
> >
> > a control winding disposed on said core for generating a charging supply and for generating a trigger signal in response to said rotating permanent magnet, said charging supply and said trigger signal corresponding to generated voltages of opposite polarity in said control winding;
> >
> > a charging capacitor;
> >
> > a charging diode having an anode connected to a first end of said control winding corresponding to a positive generated voltage during generation of said charging supply and a cathode connected to a first end of said charging capacitor, said second end of said charging capacitor being connected to said second end of said control winding;
> >
> > an SCR having an anode connected to said cathode of said charging diode, said SCR further including a cathode and a control connection;
> >
> > an ignition coil disposed on said core and including a primary winding and a secondary winding, one end of said primary winding being connected to said cathode of said SCR, the second end of said primary winding being connected to said junction of said capacitor and said control winding; and
> >
> > trigger control circuit means for connecting said control connection and said cathode of said SCR across said control winding whereby said capacitor is charged in response to said generated charging supply of said control winding and said SCR is triggered to discharge said charging capacitor into said primary winding in response to said generated trigger signal in said control winding, said secondary winding generating an ignition voltage in response to said capacitor being discharged into said primary winding.

As discussed previously the plaintiff's CDI systems are triggered by the primary winding. Further, the resistor which retards the spark is not present in the accused Phelon model.

The plaintiff challenges the validity of the '780 patent alleging that the invention was offered for sale more than one year before the patent application was filed. The first offer for sale was disputed at

---

6. The application was prepared and filed after Mr. Kiess ended his employment with the defendant. Mr. Walters prepared the disclosure and application, not Mr. Kiess.

7. The application disclosed the following United States Patents:

| | |
|---|---|
| Carmichael *et al* 3,941,111 | Bodig *et al* 3,703,889 |
| Carmichael 4,056,088 | Struber *et al* 3,704,701 |
| Burson 4,036,201 | Piteo 3,484,677 |
| Hohne *et al* 3,500,809 | Swift *et al* 3,722,488 |
| Just *et al* 3,851,636 | |

trial. Mr. Robert Lock, an ex-employee of the defendant, testified for the plaintiff. Mr. Lock was "responsible for the marketing and the development of ignition" systems. Mr. Lock's departure from the defendant was not predicated on the most favorable circumstances. Mr. Lock's credibility is weakened by his hostility and the contradictory evidence in the form of documents and witness testimony.

Mr. Lock was contacted by counsel for the plaintiff. After some discussion, Mr. Lock sent the plaintiff's counsel certain documents. These documents included Wabash headings and purported to be offers for sale of the defendant's Generation III CDI system. Three documents, plaintiff's exhibits 55, 56 and 57, were admitted at trial. Mr. Lock testified that those documents came from his personal files of information, and that those documents had been retained by him when he left Wabash. However, after extensive discovery in this case the same documents were not found in the defendant's files.

Mr. Lock testified that those "quotes" were sent to customers of the defendant, and that he received verbal confirmation of receipt from Skil and Roper. No other evidence was introduced to prove receipt by Skil or Roper. The purported quotes included a price of three dollars and twenty-five cents ($3.25) per unit. The units sold, in the real world, for four dollars and twenty cents ($4.20). The conditions of an offer, which were printed on the back of the defendant's form offer, included a clause titled "Price Adjustment" which reads:

Wabash reserves the right, upon notice to Customer, to adjust the price of Products not yet delivered to Customer, to reflect changes in material, labor, and/or other costs of production to Wabash.

There is no evidence in the record which illustrates any price adjustment from $3.25 to $4.20. However, there is evidence that the price per unit was adjusted from $4.20 to $3.83.

Mr. Green was design supervisor at Skil, from 1977 to 1979. He allegedly received one of the offers for sale from Mr. Lock.

Mr. Green testified that the design work for Skil's approval of the Generation III CDI was not completed until March 7, 1978. Mr. Green's memorandum indicated that Skil began testing the defendant's Generation III CDI to determine if it would work in conjunction with Skil products. Before a product may be purchased by Skil, the Skil engineering department must test and evaluate the product. The release of the engineering drawings is the approval which triggers any purchase. Mr. Green's memorandum, dated January 12, 1978, paragraph C, describes the "agreement" between the defendant and Skil as of January 12, 1978. One such agreement was subparagraph 1: "Wabash is to commence manufacturing the 3rd 'a' generation immediately." The same document included paragraph D titled "Required action and information from Wabash:". Subparagraph 1 of paragraph D reads: "Date when generation 3a test units can be expected for Skil engineering evaluation." In analyzing the four corners of Mr. Green's memorandum, it is clear that the manufacturing of 3a generation units referred to in subparagraph C 1 represented only 3a generation test units. Although Mr. Lock testified that he gave Mr. Green samples of the Generation III CDI on January 12, 1978, Green's memorandum suggests that Skil was waiting for delivery of units to be tested and evaluated.

Mr. Walters, Vice President and Director of Engineering at Wabash, Inc., testified at trial that when he was working with Mr. Kiess on the disclosure for the '780 patent, that he asked Mr. Lock when the first offer for sale occurred. Mr. Walters testified that Mr. Lock told him that the date of the first offer for sale of the defendant's Generation III CDI was February 24, 1978. In addition, Mr. Walters testified that the procedure for transmitting offers to customers began with discussions at Wabash, as Mr. Lock stated. The next step was that the proposal was typed at the offices in Wabash, Indiana, and then sent to Huntington, Indiana, where the sales department was located. The sales department would have stamped the document received on the date

of receipt, and then transmitted them to the appropriate customers. The documents from Mr. Lock's files do not include a date received stamp.

The defendant's accused products are three generations of the CDI system. The defendant refers to these systems as Generation I, II and III. Generation I was a product which the defendant began manufacturing under an agreement with Syncro Corporation. The defendant was licensed under the '111 patent. However, as discussed earlier the defendant's Generation I CDI was a modified version of the device disclosed in the '111 patent. In the disclosure submitted with the '780 patent application the defendant, through a representative, described the Generation I CDI and how it operated. (Appendix C) That description of how the Generation I CDI operated clearly indicates that it operated in exactly the same manner as the invention disclosed in the '837 patent, and specifically the SCR was triggered by the primary coil.

The defendant's Generation II CDI was manufactured from May 1977 to 1978. Claim 6 of the '837 patent was allegedly infringed by the defendant's Generation II. Claim 6 was not included in the '201 patent, and the application for the '837 patent was filed on June 25, 1979. The Generation II CDI included significant modifications to the Generation I CDI. The charging and primary coils were out-of-phase and produced voltages which were simultaneously of opposite polarities. In addition, the SCR was triggered by voltage induced in both the primary and charging coils.

The defendant's Generation III CDI is alleged to infringe claims 1–7, 9 and 10 of the '837 patent. The Generation III is a product which is allegedly the embodiment of the '780 patent. That product is a CDI which allegedly incorporates the circuit described in the '780 patent. (Appendix D)

One of the critical disputes involving the Generation III CDI is whether the SCR is triggered by the primary coil or charging coil. The plaintiff alleges that the Generation III CDI was triggered by the primary coil. The defendant produced evidence at trial through Dr. Richard Jereb, Vice President Wabash, Inc., that the flow of energy in the Generation III circuit at the time of triggering was mainly from the charging coil. These measurements and conclusions were accomplished using a nodal analysis in open court. Mr. Jereb testified that the energy generated in the primary coil was very small compared to the charging coil, but it was enough to trigger the SCR. Consequently the strong flow of energy from the charging coil to the SCR allegedly inhibited energy in the primary coil from effecting the SCR. In addition, Dr. Haag, an expert in the field of electrical engineering, testified for the defendant. Dr. Haag did not test or measure any of the accused products of either plaintiff or defendant. Dr. Haag relied on schematic drawings of the specific patents at issue, oscilloscope tracings which were similar to some which he observed while waiting in the "holding room" to testify, and measured valves given to him by defendant's counsel. Dr. Haag did not study the file histories of the patents at issue nor did he review the pertinent prior art. Dr. Haag and Mr. Jereb described the oscilloscope tracings as going negative or going positive. They both interpreted the tracings as indicating current flow between various pairs of nodes. A positive tracing indicates positive current flow and negative tracing indicates current flow which is not positive. Further, they both testified that the negative tracing measured between the primary coil and the SCR gate circuit indicated that the primary coil was absorbing energy at the moment triggering occurred. When asked if a voltage was induced in the primary coil both admitted that a voltage was being induced at the moment of triggering. From the facts which Dr. Haag had before him, he concluded that the Generation III CDI was triggered by the charging coil.

The plaintiff also presented evidence regarding which coil triggered the SCR. Mr. Burson testified that the circuit diagram (Appendix D) indicated that the primary coil triggered the SCR. Mr. Burson also measured the performance of a Generation

III CDI in open court. During those measurements changes in the charge coil[8] had no appreciable effect on triggering the SCR but changes in the primary coil[9] did effect the triggering of the SCR. The plaintiff hired Dr. Buck Brown, an expert in the field of electrical engineering, to do a computer analysis of the Generation III circuit. This analysis was done on a computer using a SPICE program. That specific program enables the analyst to build a specific circuit and determine how that circuit functions. Dr. Brown concluded and testified that the Generation III CDI was triggered by the primary winding. As part of his analysis Dr. Brown studied the patents at issue and the file histories applicable to those patents. In addition, he studied most of the prior art which the defendant alleges as pertinent. Of the thirty-eight (38) patents listed in defendant's exhibit J, Dr. Brown testified that he did not specifically remember three. Dr. Brown admitted that two of the values used to create one of the circuits which were analyzed were reversed and would have caused subsequent values to be in error. However, Dr. Brown did not testify, on direct, concerning the one analysis which contained errors, and he stated that he did not rely on that one analysis to reach the conclusions he expressed.

The defendant's accused Generation III CDI system charges the capacitor in substantially the same way as the method disclosed in claim 1 (Appendix E) of the '837 patent. In addition, the defendant's accused Generation III CDI system triggers the gate of the SCR, and renders it conductive in substantially the same way as the method disclosed in the '837 patent. Finally, the legs of the ferromagnetic core in the defendant's accused Generation III CDI system are equivalent to the legs of the ferromagnetic core disclosed in the '837 patent.

The defendant alleges that the plaintiff's model 10885–05 of infringes claim 12 of the Kiess patent. The facts described in the preceding paragraphs regarding whether the primary or charging coil triggers the SCR are applicable to that allegation. The same conclusions were reached by the same witnesses about the triggering of both the defendant's Generation III CDI and the plaintiff's model 10885–05. There is no need to discuss either triggering mechanism again.

### The '442 Patent

It is also alleged, by the defendant, that claim 1 of the Wolf patent is infringed by the plaintiff's model 10885–05. Claim 1 reads:

1. In a capacitor discharge ignition system for use with and positioned adjacent a rotating magnetic field in synchronism with the operation of an engine, a capacitor discharge ignition sub-assembly for mounting on a ferromagentic core, the capacitor discharge ignition sub-assembly comprising:

an auxiliary coil;

an ignition transformer including primary and secondary coils;

a coil support member, said auxiliary coil and said primary and secondary coils being concentrically disposed on said coil support member about a common axis;

electrical circuitry means interconnecting said auxiliary coil and said primary coil and being responsive to said auxiliary coil for providing energy to said primary coil in response to induced electrical energy in said auxiliary coil as a result of the rotating magnetic field; and

a housing for receiving and enclosing said auxiliary coil, said ignition coil and said circuitry means, said auxiliary coil being disposed about a first portion of said coil support member, said ignition transformer being disposed about a second portion of said coil support member adjacent said first portion and said electrical circuitry means being

---

8. Mr. Burson reduced, by one-half, the number of windings in the charging coil.

9. Mr. Burson reduced, by one-half, the number of windings in the primary coil.

disposed about said auxiliary coil and between said auxiliary coil and said housing, said auxiliary coil being fabricated having a coil height dimension that is a substantial portion of the outer winding diameter dimension of said auxiliary coil, said substantial portion being at least a factor of one-half.

The original model 10885–00–A was first sold on March 15, 1978. The Wolf patent application was filed on July 24, 1980, and issued June 8, 1982. The first model 10885 evolved to model 10886–05. An examination of plaintiff's exhibit 20 illustrates that the first 10885 was comprised of the electrical circuitry disposed about the [charging] coil. Through the evolution from 10885–00 to 10885–05 the plaintiff eliminated the circuit board and grouped the "electrical circuitry" components on one side of the charge coil. However, the electrical circuitry remained disposed about the charging coil.

The Wolf patent application was filed more than two years after the first model 10885 was sold. That application did not disclose the existence of the plaintiff's model 10885.

### III.

■ There are three patents at issue in this litigation; the validity of all three has been challenged. Validity encompasses three "separate tests of patentability": novelty, utility and non-obviousness. *United States v. Adams*, 383 U.S. 39, 48, 86 S.Ct. 708, 712, 15 L.Ed.2d 572, 148 USPQ 479 (1966); see also *Structural Rubber Products Co. v. Park Rubber Co.*, 749 F.2d 707, 714, 223 USPQ 1264 (Fed.Cir.1984). "The ultimate question of validity is one of law." *Graham v. John Deere*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545, 148 USPQ 459 (1966); *Structural Rubber*, 749 F.2d at 714. "The burden of establishing the validity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282 (1976). That burden is permanent and does not shift. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358, 220 USPQ

763 (Fed.Cir.1984), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41, 224 USPQ 520 (1984); *South Corporation v. United States*, 690 F.2d 1368, 1369, 215 USPQ 657 (Fed.Cir.1982). The burden of establishing invalidity includes overcoming a presumption that the patent is valid. *Windsurfing International, Inc. v. AMF, Inc.*, 782 F.2d 995, 998, 228 USPQ 562 (Fed.Cir.1986); *Ralston Purina Co. v. Far-Mar-Co., Inc.*, 772 F.2d 1570, 1573, 227 USPQ 177 (Fed. Cir.1985); *Structural Rubber*, 749 F.2d at 714; *Environtech Corp. v. Al George, Inc.*, 730 F.2d 753, 762, 221 USPQ 473 (Fed.Cir. 1984); *W.L. Gore and Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1543, 220 USPQ 303 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). The presumption was originally created in the courts and subsequently included in the Patent Act of 1952 in Section 282. *American Hoist*, 725 F.2d at 1359. The United States Court of Appeals for the Federal Circuit continues to require strict enforcement of that presumption. The presumption is derived from the basic proposition that a government agency such as the Patent and Trademark Office is presumed to do its job. *Morgan v. Daniels*, 153 U.S. 120, 125, 14 S.Ct. 772, 773, 38 L.Ed. 657 (1894); *accord, American Hoist*, 725 F.2d at 1359. The presumption translates into three separate presumptions of novelty, utility and non-obviousness. *Structural Rubber*, 749 F.2d at 714; *cf. Adams*, 383 U.S. at 48, 86 S.Ct. at 712. Those presumptions are applicable to reissue patents as well. *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1139, 227 USPQ 543 (Fed.Cir.1985).

The party asserting invalidity must demonstrate that invalidity by clear and convincing evidence. *Structural Rubber*, 749 F.2d at 714; *American Hoist*, 725 F.2d at 1360. "Before rendering its judgment the court must determine whether 'All of the evidence establishes that the validity challenger so carried his burden as to have persuaded the decision maker that the patent can no longer be accepted as valid.'" *Ralston Purina*, 772 F.2d at 1573, *quoting, Lear Siegler, Inc. v. Aeroquip Corp.*,

733 F.2d 881, 885, 221 USPQ 1025, 1028 (Fed.Cir.1984). The clear and convincing burden was described by Justice Cardozo, writing for the Supreme Court of the United States, as one which requires "more than a dubious preponderance." *Radio Corp. of America v. Radio Engineering Laboratories, Inc.*, 293 U.S. 1, 8, 54 S.Ct. 752, 755, 78 L.Ed. 1453 (1934); *see also, American Hoist*, 725 F.2d at 1359.

■ When no prior art, other than that which was considered by the patent examiner is relied on by the challenger, he has the added burden of overcoming the deference that is due to a qualified government agency, presumed to have properly done its job, which includes one or more examiners who are assumed to have expertise in interpreting the references having done so. *American Hoist*, 725 F.2d at 1359. However, when the challenger "produces prior art or other evidence *not* considered in the PTO there is no reason to defer to the PTO so far as its effect on validity is concerned." *Id.* (emphasis in original).

Recently, the United States Court of Appeals for the Federal Circuit announced several tenets of patent law which "must be adhered to when applying Section 103." *Hodosh v. Block Drug Co.*, 786 F.2d 1136, 1143, fn. 5, 229 USPQ 182 (Fed.Cir.1986). Those tenets are as follows:

(1) The claimed invention must be considered as a whole;

(2) the references must be considered as a whole and suggest the desirability and thus the obviousness of making the combination;

(3) the references must be viewed without the benefit of hindsight vision afforded by the claimed invention;

(4) "ought to be tried" is not the standard with which obviousness is determined; and

(5) the presumption of validity remains constant and intact throughout litigation (citations omitted).

*Id.* Those tenets have been strictly adhered to by this court.

### The '837 Patent

Under the standards previously announced, the court now considers whether the defendant has carried the burden of persuasion. That burden includes overcoming the three separate presumptions of novelty, utility and non-obviousness. *United States v. Adams*, 383 U.S. 39, 48, 86 S.Ct. 708, 712, 15 L.Ed.2d 572, 148 USPQ 479 (1966); see also, *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 227 USPQ 543 (Fed.Cir.1985); *Ralston Purina Co. v. Far-Mar-Co., Inc.*, 772 F.2d 1570, 227 USPQ 177 (Fed.Cir.1985); *Structural Rubber Products Co. v. Park Rubber Co.*, 749 F.2d 707, 223 USPQ 1264 (Fed.Cir. 1984); *W.L. Gore and Assoc., Inc. v. Garlock, Inc.* 721 F.2d 1540, 220 USPQ 303 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). Very little, if any, evidence challenging the novelty or utility has been presented. Consequently, the defendant has not carried the burden of persuasion as to novelty or utility.

■ There has been a substantial amount of evidence relevant to the question of non-obviousness. The defendant asserts that the '837 patent was obvious to a person skilled in the art at the time of the invention. A person skilled in the art is one with a degree in electrical engineering and a few years experience working with CDI systems.

To support that allegation the defendant relies on the prior art cited by the patent examiner during the original and reissue prosecutions, one prior Carmichael Patent, and five prior Burson Patents. The patent examiner considered most of the prior art available. The prior art before the examiner involved capacitive discharge ignition systems which had the charging coil on a separate leg of the ferromagnetic core from the primary and secondary coils, and some of the prior art contained a distinct triggering coil separated from the other coils. One prior art patent, Piteo No. 3,484,677, had all operative coils on the same leg of the ferromagnetic core. However, that patent disclosed an inductive ig-

nition system which did not store the charge or require a trigger to release the charge. Unlike the prior art the '837 patent was comprised of a ferromagnetic core which included the charging, primary, and secondary coils on the same leg of a multi-legged ferromagnetic core. Further, the charging coil charged the capacitor and the primary coil triggered the release of that charge.

The prior art which the defendant produced which was not considered by the patent examiner is similar to that which the examiner did consider. Nothing in the prior art which the patent examiner did not consider teaches the subject matter of the '837 patent, nor does it indicate that that subject matter would have been obvious to one skilled in the art at the time of the invention. *Cable Electric Products, Inc. v. Genmark, Inc.,* 770 F.2d 1015, 1025, 226 USPQ 881 (Fed.Cir.1985); *Leinoff v. Milona & Sons, Inc.,* 726 F.2d 734, 220 USPQ 845 (Fed.Cir.1984).

In addition, the plaintiff presented evidence of secondary considerations. Secondary considerations include commercial success, long felt but unsolved needs, and failure of others. *Graham v. John Deere,* 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545, 148 USPQ 459 (1966); *Great Northern Corp. v. Davis Core & Pad Co.,* 782 F.2d 159, 165, 228 USPQ 356 (Fed.Cir.1986); *Simmons Fastener Corp. v. Illinois Tool Works,* 739 F.2d 1573, 1575, 222 USPQ 744 (Fed.Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538–39, 218 USPQ 871 (Fed.Cir. 1983); *Air-Vend, Inc. v. Thorne Industries, Inc.,* 625 F.Supp. 1123 (D.Minn.1985); *Torin Corp. v. Phillips Industries, Inc.,* 625 F.Supp. 1077, 1091, 228 USPQ 465 (S.D. Ohio 1985). Evidence of secondary considerations "when present must be considered and afforded appropriate weight," "not just when the decision maker remains in doubt after reviewing the art." *Interconnect Planning,* 774 F.2d at 1144; *Cable Electric,* 770 F.2d at 1026. The appropriate weight to be given any evidence of secondary consideration depends on the

"nexus between the merits of the claimed invention and the evidence of secondary consideration." *Cable Electric,* 770 F.2d at 1026, *quoting, Simmons Fastner,* 739 F.2d at 1575.

The commercial success of the invention disclosed in the '837 patent is apparent from the rapid growth in sales following the introduction of that CDI system. The defendant suggests that that evidence is due to the decrease in price. However, the decrease in price which enabled the CDI to be cost competitive in the marketplace is directly attributable to the ability to stack all the operative coils on the same leg of the ferromagnetic core. In addition, the unrefuted testimony at trial clearly indicated that the market place had been searching for a cost competitive CDI to be used with small gasoline engines for some time. This invention filled that need. Therefore there is a definite nexus between the claimed invention and the evidence of secondary considerations.

■ The defendant also challenges the validity of the '837 patent under section 112 of Title 35 of the United States Code. The test under section 112 is "whether the disclosure of the application relied upon 'reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter.'" *Ralston Purina,* 772 F.2d at 1575, *quoting, In re Kaslow,* 707 F.2d 1366, 1375, 271 USPQ 1089, 1096 (Fed.Cir.1983). The judgment under section 112 "must be determined on a case-by-case basis." *Id., citing, In re Wilder,* 736 F.2d 1516, 1520, 222 USPQ 369, 372 (Fed.Cir.1984), *cert. denied, sub nom. Wilder v. Mossinghoff,* — U.S. —, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985). The record in this case reveals that the misplaced polarity dot is not critical in light of the testimony that to a person skilled in the art at the time of this invention it would have been obvious to change the polarity of the primary coil. Based on the record in this case and the knowledge possessed by a person skilled in the art of electrical engineering, the claims of the '837 patent do

not violate section 112 of Title 35 of the United States Code because they are supported by the original disclosure. *Accord, Ralston Purina,* 772 F.2d at 1576.

■■■ The defendant also argues that dependent claim 9 of the '837 patent is invalid based on a combination of file wrapper estoppel and recapture doctrines. The allegation is that claim 9 is substantially the same as proposed claim 15 of the '201 patent, which was rejected. Proposed claim 15 of the '201 patent was rejected just before Mr. Dempsey assumed responsibilities for the prosecution of the patent application. Proposed claim 15 was not amended or renewed. The defendant apparently argues for a hybrid of the two doctrines to be applied. File wrapper estoppel is applied when a patentee having chosen "specific words of limitation" to avoid the patent examiner's rejection later seeks a broader interpretation of the limited claim. *Loctite Corp. v. Ultraseal, LTD.,* 781 F.2d 861, 870–71, 228 USPQ 90 (Fed.Cir.1985); *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362, 219 USPQ 473 (Fed.Cir.1983). However, limiting claims "does not always mean that the doctrine of file wrapper estoppel completely prohibits a patentee from recapturing some of what was originally claimed." *Bayer Aktiengesellschaft v. Duphar International Research,* 738 F.2d 1237, 1243, 222 USPQ 649 (Fed.Cir.1984); *see also, Loctite,* 781 F.2d at 871; *compare, Prodyne Enterprises, Inc. v. Julie Pomerantz, Inc.,* 743 F.2d 1581, 223 USPQ 477 (Fed.Cir.1984); *Kinzenbaw v. Deere & Co.,* 741 F.2d 383, 222 USPQ 929 (Fed.Cir.1984), *cert. denied,* 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985). Recapture is the doctrine which permits a patentee to expand the coverage of his patent by applying for a reissue patent. *Sontag Chain Stores Co. v. National Nut Co.,* 310 U.S. 281, 60 S.Ct. 961, 84 L.Ed. 1204, 45 USPQ 448 (1940); *Seattle Box Co. v. Industrial Crating & Packing, Inc.,* 756 F.2d 1574,

1579, 225 USPQ 357 (Fed.Cir.1985). The intent is to permit an inventor to protect the entire scope of his invention. *Id.* The failure to claim the entire invention must be due to inadvertence, accident or mistake, and must be without fraudulent or deceptive intention. *Id.* In addition, intervening rights may be granted to protect innocent infringers. *Id., Seattle Box,* 756 F.2d at 1579.

■■ The basis of the rejection of proposed claim 15 was indefiniteness under section 112, and as anticipated by Carmichael '111. The rewritten claims and remarks following those claims distinguished the prior art and resolved the indefiniteness rejection.[10] Neither the remarks of the plaintiff's counsel nor the language suggested to overcome indefiniteness are directly related to the subject matter of proposed claim 15 of the '201 patent or dependent claim 9 of the '837 patent. Those two claims, when compared, are not substantially the same.

The presumption of validity is applicable to the dependent claim 9 of the '837 patent. The patent examiner considered all the prior art including the prosecution history of the '201 patent. The defendant has not presented clear and convincing evidence that dependent claim 9 of the '837 patent is invalid. The subject matter of dependent claim 9 of the '837 patent is within the scope of the original disclosure. There is no evidence to support the allegation that the omission was made with fraudulent or deceptive intent.

The defendant has not demonstrated by clear and convincing evidence that the subject matter of the '837 patent would have been obvious to a person skilled in the art at the time of the invention. In fact, the plaintiff has clearly demonstrated that the subject matter of the '837 patent met the criteria of novelty, utility and non-obviousness. Therefore, the United States Patent No. Re. 31,837 is not invalid under section 103 of Title 35 of the United States Code,

---

10. The patent examiner suggest the mere adoption of the following language would solve the rejection under section 112:

... permanent magnet means adapted to be rotated about a circular path in synchronism with the operation of said engine ...

or under section 112 of Title 35 of the United States Code.

### The '780 Patent

The plaintiff challenges the non-obviousness of the '780 patent under Section 103 of Title 35 of the United States Code. To prevail, the plaintiff must overcome the presumption of validity. *Windsurfing International,* 782 F.2d at 998; *Ralston Purina,* 772 F.2d at 1573. All of the prior art cited by the plaintiff was considered by the patent examiner. Due to the assumption that patent examiners have expertise in interpreting the prior art, a court should give deference to the patent examiner's finding of non-obviousness. *American Hoist,* 725 F.2d at 1359. Prior art or other evidence not considered by the patent examiner is analyzed and applied without deferential treatment. *Id.* The plaintiff argues that the defendant's Generation I and II CDI systems are other evidence not considered by the patent examiner. Further, that such evidence in conjunction with the prior art which was considered by the patent examiner teach the subject matter of the '780 patent. The defendant's Generation I is very similar to the '201 patent, but is licensed under the '111 patent. Both of those patents were considered by the patent examiner. The plaintiff has not produced evidence which even suggests that the defendant's Generation I CDI system teaches anything in addition to the prior art considered by the patent examiner. However, the defendant's Generation II CDI system is significantly different from Generation I. Mr. Jereb testified that the defendant's Generation II CDI system included charging and primary coils which were out-of-phase and connected in a series aiding arrangement. The SCR was triggered by both the primary and the charging coils. In addition, the resistor 68 in figure 2 of the '780 patent (Appendix D) was present in the defendant's Generation II CDI system. That resistor allegedly provided a means for the SCR to be triggered by the charging coil as well as the primary. Further, the placement of the resistor across

the limiting diode allegedly provided a means to achieve timing control.

■ As expressed in the discussion of the '837 patent, switching the coils from an out-of-phase to an in-phase arrangement would have been obvious to one skilled in the art. A change from series aiding to series opposing arrangement would also have been obvious to one skilled in the art. The differences between the defendant's Generation II CDI system and the subject matter of the '780 patent would have been obvious to one skilled in the art. When the other evidence not considered by the patent examiner and the prior art are analyzed it is apparent that the plaintiff has presented clear and convincing evidence that the subject matter of the '780 patent would have been obvious to one skilled in the art. *See, Hodosh v. Block Drug Co.,* 786 F.2d 1136, 229 USPQ 182 (Fed.Cir.1986). Therefore, the United States Patent No. 4,228,780 is invalid under section 103 of Title 35 of the United States Code.

### The '442 Patent

■ The plaintiff also challenges the '442 patent under section 103 of Title 35 of the United States Code. The defendant alleges that Claim 1 of the '442 patent is infringed by the plaintiff's part no. 10885–05. The plaintiff has not presented any prior art which was not considered by the patent examiner, but the plaintiff did introduce other evidence which was not considered by the patent examiner. Specifically the plaintiff introduced the original part no. 10885–00 from which 10885–05 evolved. Part no. 10885–00 was not the subject matter of a patent. However, part no. 10885–00 has the electrical circuitry disposed about or around the charge coil. Furthermore, part no. 10885–00 was first sold on March 15, 1978. Consequently, part no. 10885–00 was available in the market place more than two years before the '442 patent application was filed. The other evidence presented to the court is not burdened by any deference to the patent office. *See, American Hoist,* 725 F.2d at 1359. After analyzing this allegation under the tenets

expressed in *Hodosh,* it is apparent that the plaintiff has presented clear and convincing evidence that the subject matter of the '442 patent would have been obvious to one skilled in the art. Consequently, United States Patent No. 4,333,442 is invalid under section 103 of Title 35 of the United States Code.

## ON SALE DOCTRINE

A patent may be invalid if the subject matter of that patent was "on sale" or in public use more than one year before the date that the patent application was filed. 35 U.S.C. § 102 (1976). A three part test applicable to this portion of the statute was enunciated in *Timely Products Corp. v. Arron,* 523 F.2d 288, 187 USPQ 257 (2d Cir.1975); *but see, Barmag Barmer Maschinenfabrik v. Murata Machinery, LTD.,* 731 F.2d 831, 836–37, 221 USPQ 561 (Fed. Cir.1984) (describing the *Timely Products* test as restrictive). That a test requires: "(1) The complete invention claimed must have been embodied in or obvious in view of the things offered for sale; (2) the invention must have been tested sufficiently to verify that it is operable and commercially marketable; and (3) the same must be primarily for profit rather than for experimental purposes." *Id.* at 302. However, the United States Court of Appeals for the Federal Circuit has not "adopted for all cases" the test of *Arron. King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 860, 226 USPQ 402 (Fed.Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). The court stated in *King Instrument* that "a less stringent standard might be appropriate in some circumstances where the underlying statutory policies might otherwise be frustrated." *Id.* The policies embodied in section 102 include:

> (1) discouraging removal of inventions from the public domain which the public justifiably comes to believe are freely available; (2) favoring prompt and widespread disclosure of inventions to the public; (3) giving the inventor a reasonable amount of time (one year, by statute) following sales activity to determine

whether a patent has value or is worthwhile; and (4) prohibiting attempts to exploit commercially an invention more than one year before the application is filed.

*Western Marine Electronics, Inc. v. Furuno Electric Co., Ltd.,* 764 F.2d 840, 845, 226 USPQ 334 (Fed.Cir.1985); see also, *King Instrument,* 767 F.2d at 860; *Air-Vend, Inc. v. Thorne Industries, Inc.,* 625 F.Supp. 1123, 1131 (D.Minn.1985); *Torin Corporation v. Philips Industries, Inc.,* 625 F.Supp. 1077, 1088, 228 USPQ 465 (S.D. Ohio 1985). Those policies concentrate on the attempt by the inventor to exploit the invention not whether the potential purchaser was cognizant of the invention. *King Instrument,* 767 F.2d at 860. A mere "offer to sell is sufficient." *Id.; see also, D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1147, 219 USPQ 13 (Fed.Cir.1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 83, 88 L.Ed.2d 68 (1985). However, a "bare unexplained offer, not explicitly shown to be of the new invention, may be insufficient[;] the totality of the circumstances must always be considered in order to ascertain whether an offer of the new invention was in fact made." *King Instrument,* 767 F.2d at 860; see also *Barmag,* 731 F.2d at 837. The standard, under section 102, requires more than a reduction to practice. *Id.* The invention must be "in a commercially satisfactory stage of development." *King Instrument,* 767 F.2d at 861; *Barmag,* 731 F.2d at 838. To prevail, the party challenging validity must demonstrate by clear and convincing evidence that the subject matter of the patent was "on sale" under section 102 of Title 35 of the United States Code. *Id.*

Two of the patents at issue in this case have been challenged under the "on sale" limitation of section 102. The '837 patent has been challenged as being offered for sale more than one year before the patent application was filed. The defendant alleges that when Mr. Phelon visited Homelite, a customer, that he offered to sell the subject matter of the '837 patent. Mr. Phelon admits that during a visit to Homel-

ite he "discussed in general terms" a new CDI with fixed timing, and that he asked Homelite if they would be interested in a fixed timing CDI. However, Mr. Phelon testified that he never offered to sell the device to Homelite.

Although a mere offer to sell is sufficient, the standard also requires more than a mere reduction to practice. *King Instrument,* 767 F.2d at 860; *Barmag,* 731 F.2d at 838; *D.L. Auld,* 714 F.2d at 1147. The invention disclosed by the '837 patent had not been developed to a commercially satisfactory stage at the time of Mr. Phelon's visit to Homelite. Further, those standards must be analyzed in light of the policies embodied in section 102 of Title 35 of the United States Code. *King Instrument,* 767 F.2d at 860; *Barmag,* 731 F.2d 836. In this case, the specific inquiry from Mr. Phelon to Homelite does not rise to the level of disclosure or inquiry which meets the test or violates the policies of section 102. The United States Patent No. Re. 31,837 is neither invalid nor unenforceable under section 102 of Title 35 of the United States Code.

The validity of the '780 patent has also been challenged under section 102 of Title 35 of the United States Code. The plaintiff alleges that the subject matter of the '780 patent was offered for sale more than one year before the patent application was filed. The direct testimony of Mr. Lock and the documents provided by Mr. Lock support the plaintiff's allegation. However, the direct testimony of Mr. Walters and Mr. Kiepper, the other documentary evidence, and Mr. Lock's lack of credibility contradict the plaintiff's allegation. The plaintiff has not demonstrated by clear and convincing evidence that the subject matter of the '780 patent was on sale under section 102. Consequently, United States Patent No. 4,228,780 is not invalid or unenforceable under section 102 of Title 35 of the United States Code.

## NEW MATTER

The defendant also challenges the validity of the '837 patent under section 132 of Title 35 of the United States Code. Section 132 prohibits the addition of new matter to the disclosure of the invention. 35 U.S.C. § 132 (1976). New matter is defined as, any departure from or addition to the disclosure which does not conform to at least the specification, claims or drawings. 35 CFR § 118 (1985). However, "matter which is added that is deemed inherent in the original application is not considered new matter." *Litton Systems, Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1438–39, 221 USPQ 97 (Fed.Cir.1984); *B.W.B. Controls, Inc. v. U.S. Industries, Inc.* 626 F.Supp. 1553, 1569–70, 228 USPQ 799 (E.D. La.1985); *but see, Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d 1423, 227 USPQ 138 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986). In addition, the "fact that the Patent Office [now Patent and Trademark Office] permitted an amendment to be entered necessarily means that it did not consider such amendments as 'new matter' within the meaning of" section 132. *Dart Industries, Inc. v. E.I. DuPont DeNemours & Co.,* 348 F.Supp. 1338, 175 USPQ 540 (N.D.Ill.1972), rev'd on other grounds, 489 F.2d 1359, 179 USPQ 392 (7th Cir.1973) *cert. denied,* 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236, 182 USPQ 1 (1974); *Reeves Bros., Inc. v. U.S. Laminating Corp.,* 282 F.Supp. 118, 157 USPQ 235 (D.C.NY 1968), *aff'd* 417 F.2d 869, 163 USPQ 577 (2d Cir. 1968); *Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems Co.,* 169 F.Supp. 1, 120 USPQ 34 (D.C.Pa.1958), *aff'd* 268 F.2d 395, 121 USPQ 363 (3rd Cir.1959), *cert. denied,* 361 U.S. 894, 80 S.Ct. 198, 4 L.Ed.2d 151, 123 USPQ 589 (1958). The implicit determination by the Patent Office is "presumptively correct." *Reeves Bros.,* 282 F.Supp. at 130.

The defendant argues that the movement of a polarity dot in Figure 7, of the '837 patent, from the end of the primary coil closest to ground, to the opposite end, as well as some language added to the specification constitutes "new matter" under section 132. However, the movement of the

dot and the additional language were permitted by the patent examiner.

Claim 1 of the '201 patent described the voltage induced in the charging and primary coils as: "... simultaneously inducing in said charging winding and said primary winding voltage wave forms comprised of two half cycles of opposite polarity ..." The defendant argues that this language describes wave forms which are out-of-phase. It is clear that the words "opposite polarity" describe the half cycles which comprise each separate wave form induced in the primary and charging coils. There was no definitive language which mandated that the wave forms be out-of-phase. There was, however, testimony at trial which clearly indicates that this invention would not function properly if the charging and primary coils were out-of-phase. The testimony also indicated that a person skilled in the art would have known, with or without polarity dots, that the invention was to be constructed with the charging and primary coils connected in-phase.

Claim 16 which became claim 1 of the original and reissue patents clarified whatever ambiguity may have existed in the original language. The rewritten claim reads *inter alia:* "... said charging winding and said primary winding which are simultaneously at the same polarity ..." The change was a natural change to clarify the position of the polarity dot, and such a correction would have been, to a person skilled in the art, "inherent in the original application." See *Litton Systems,* 728 F.2d at 1438–39; *B.W.B. Controls,* 626 F.Supp. at 1569–70. The defendant also argues that "new matter" was introduced when some language was added to the specification. At page 10, line 6, after "voltage" the words "as seen by diode 82" were added and at line 8, after "assembly" the words "as seen by gate 86 of the SCR" were added. That language is neutral and neither departs from nor adds to the disclosure.

■ The defendant has not met the burden on the issue of "new matter" under section 132 of Title 35 of the United States Code. The evidence is wholly insufficient to overcome the presumption of validity under section 132. Therefore, United States Patent No. Re. 31,837 is not invalid or unenforceable under section 132 of Title 35 of the United States Code.

## INTERVENING RIGHTS

■ The doctrine of intervening rights protects persons who innocently develop and manufacture an invention not specifically claimed by a patent. *Sontag Chain Stores Co. v. National Nut Co.,* 310 U.S. 281, 290, 60 S.Ct. 961, 965, 84 L.Ed. 1204, 45 USPQ 448 (1940); *Seattle Box Co. v. Industrial Crating and Packing,* 756 F.2d 1574, 1579, 225 USPQ 357 (Fed.Cir.1985). Although "recapture through a reissue patent of what is dedicated to the public by omission in the original patent is permissible under specific conditions", it will not be permitted "at the expense of innocent parties." *Id.,* 310 U.S. at 293, 60 S.Ct. at 967; 756 F.2d at 1579.

■ The defendant developed and first offered for sale the accused Generation III CDI in 1978. The application for reissue was filed on June 25, 1979 and the reissue patent issued on February 26, 1985. Claims 6–10 of the '837 patent were added during the prosecution of the reissue application. Those claims cannot be infringed by products developed "before the grant of the reissue." 35 U.S.C. § 252 (1976). Section 252 of Title 35 of the United States Code requires "substantial preparation" by the party seeking intervening rights. *Id.* In this case, the defendant conducted substantial preparation on the Generation III CDI system before the grant of the '837 patent. Therefore, the defendant should have intervening rights as to claims 6–10 of the United States Patent No. Re. 31,837.

■ Intervening rights is an equitable doctrine. *Seattle Box,* 756 F.2d at 1579. The extent of the intervening rights is left to the broad equity powers of the court. *Id.* In this case, the Court believes that the intervening rights should extend to the

date of the grant of the reissue and not beyond. Therefore, the defendant's intervening rights as to claims 6–10 of the '837 patent extend from July 19, 1977 until February 26, 1985 under section 252 of Title 35 of the United States Code.

## INEQUITABLE CONDUCT

■ There is a two-prong test for establishing inequitable conduct before the PTO; (1) the information withheld must be material; and (2) the misrepresentation must be intentional. *J.P. Stevens & Co., Inc. v. Lex Tex LTD, Inc.*, 747 F.2d 1553, 1559, 223 USPQ 1089 (Fed.Cir.1984), *cert. denied*, —— U.S. ——, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985); *American Hoist*, 725 F.2d at 1362; *B.W.B. Controls*, 626 F.Supp. at 1569; 35 U.S.C. § 282 (1976). Information "is material where there is [1] a substantial likelihood that [2] a reasonable examiner [3] would consider it important [4] in deciding to allow the application to issue as a patent." *J.P. Stevens*, 747 F.2d at 1559; *American Hoist*, 725 F.2d at 1362; 37 CFR § 1.56(a) (1985). In addition, the burden of proof to establish inequitable conduct before the PTO is on the party alleging the inequitable conduct. The party asserting inequitable conduct must demonstrate that inequitable conduct by clear and convincing evidence. 37 CFR § 1.56(d) (1985). Similarly, any failure to meet the duty of candor must be proven by evidence of bad faith or gross negligence. *Id.* However, "An applicant's failure to meet his 'duty to disclose to the office information ... which is material will not in itself render a patent invalid or unenforceable.'" *American Hoist*, 725 F.2d at 1364. Inequitable conduct may only be determined by a careful balancing of intent in light of materiality. *J.P. Stevens*, 747 F.2d 1560; *American Hoist*, 725 F.2d at 1364. Once the balancing is completed the court must "determine as a matter of law whether the scales tilt to a conclusion that inequitable conduct occurred." *Id.*

■ The defendant makes a myriad of accusations directed at proving inequitable conduct before the PTO. All of the allega-

tions of inequitable conduct before the PTO or breach of the duty of candor are similar in content and fail for similar reasons. The information introduced by the defendant to demonstrate inequitable conduct before the PTO does not meet the definition of "material". In the real world the patent examiner who examined the '201 and '837 patent applications had many prior art references before him. All of the prior art and other evidence which the defendant has produced lack any significant difference from the totality of references before the patent examiner. Information which is "merely cumulative is not material." *J.P. Stevens*, 747 F.2d at 1560, citing *Kimberly-Clark Corp v. Johnson & Johnson*, 745 F.2d 1437, 1455–56 (Fed.Cir.1984). The defendant has failed to prove that the prior art and other evidence was material.

■ The plaintiff's attorney told the patent examiner that no answer had been filed in this case when clearly one had been filed. "Inequitable conduct requires proof of a threshold intent." *J.P. Stevens*, 747 F.2d at 1560. Intent "need not be proven with direct evidence", and "may be proven by showing acts the natural consequences of which are presumed intended by the actor." *Id.* (Citations omitted). Gross Negligence is also sufficient to demonstrate inequitable conduct. *Id.* However, "simple negligence, oversight, or an erroneous judgment made in good faith, is insufficient." *Id.; Orthopedic Equip. Co. v. all Orthopedic Appliances*, 707 F.2d 1376, 1383, 217 USPQ 1281 (Fed.Cir.1983). The explanation offered by the plaintiff's attorney indicated that his statement was in error. The defendant has not demonstrated that the plaintiff's attorney acted with intent, in bad faith, or that such acts were gross negligence. Consequently, the defendant has failed to demonstrate by clear and convincing evidence that the prior art or other evidence was withheld with an intent to defraud the PTO or that such conduct breached the duty of candor.

## INFRINGEMENT

There can be two types of infringement: literal or equivalent. *Graver Tank &*

*Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, 85 USPQ 328 (1950); *see also, Great Northern Corp. v. Davis Core & Pad Co., Inc.*, 782 F.2d 159, 165–166, 228 USPQ 356 (Fed.Cir.1986); *Loctite Corp. v. Ultraseal, LTD.*, 781 F.2d 861, 865–870, 228 USPQ 90 (Fed.Cir.1985); *Datascope Corp. v. SMEC, Inc.*, 776 F.2d 320, 324–326, 226 USPQ 402 (Fed.Cir.1985); *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 862, 226 USPQ 402 (Fed.Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986); *Radio Steel & Mfg. Co. v. MTD Products, Inc.*, 731 F.2d 840, 847, 221 USPQ 657 (Fed.Cir.1984), *cert. denied,* 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 62 (1984); *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1360–1366, 219 USPQ 473 (Fed. Cir.1983). The party alleging infringement has the "burden of proving infringement by a preponderance of the evidence." *Hughes Aircraft,* 717 F.2d at 1361, *citing, Roberts Dairy Co. v. United States,* 182 USPQ 218, 227 (Trial Div., Ct.Cl.1974), *aff'd,* 530 F.2d 1342, 1357, 198 USPQ 383 (Ct.Cl.1976).

### Defendant's Generation I CDI System

■■■■ The plaintiff alleges that claims 1–5 of the '837 patent are infringed by all the defendant's Generation I CDI systems manufactured or sold after July 19, 1977. Literal Infringement analysis begins by looking at the language of the claims asserted. (Appendix E) *King Instrument,* 767 F.2d at 862. Further, "[p]atent infringement is determined by a comparison of the claims of the patent with the accused device of the infringer." *Darda, Inc., USA v. Majorette Toys (U.S.), Inc.,* 627 F.Supp. 1121, 1136, 229 USPQ 103 (S.D.Fla. 1986), *citing, Amstar Corp. v. Envirotech Corp.,* 730 F.2d 1476, 221 USPQ 649 (Fed. Cir.1984), *cert. denied,* 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 240, 244 USPQ 616 (1984); *ACS Hospital Systems, Inc. v. Montefiore Hospital,* 732 F.2d 1572, 221 USPQ 929 (Fed.Cir.1984). The claims at issue have been interpreted in previous sections of this opinion and that process need not be repeated here. A careful comparison of claims 1–5 of the '837 patent and the defendant's accused Generation I CDI system reveals that claims 1–5 of the '837 patent read on the defendant's accused Generation I CDI system. Consequently all of the defendant's Generation I CDI systems sold or manufactured after July 19, 1977 infringe the plaintiff's United States Patent No. Re. 31,837. Claims 6–10 of the '837 patent were not issued until February 26, 1985 and there was no evidence that the defendant sold or manufactured the accused Generation I CDI systems after that date. Therefore, claims 6–10 of the United States Patent No. Re. 31,387 are not infringed by the defendant's Generation I CDI systems.

### Defendant's Generation II CDI Systems

The plaintiff alleged that the defendant's accused Generation II CDI system infringed claim 6 of the '837 patent. However, no argument or evidence at trial was directed to prove such infringement. In addition, in the plaintiff's post-trial brief no argument is presented to support a finding of infringement by the defendant's Generation II CDI. The record clearly demonstrates that the defendant's Generation II CDI system could not infringe claim 6 of the '837 patent. Claim 6 of the '837 patent is a new claim which was granted during the reissue prosecution. The defendant's Generation II CDI system was only produced from May 1977 to 1978. Since the '837 patent, and accordingly claim 6, did not issue until February 26, 1985, the defendant's Generation II CDI could not infringe claim 6.

### Defendant's Generation III CDI System

The plaintiff alleges that the defendant's Generation III CDI system infringes claims 1–5, 6–7 and 9–10 of the '837 patent. First, the court will address the allegations of infringement of claims 1–5 of the '837 patent. The defendant argues that claims 1–5 do not read on the accused Generation III CDI system for two reasons.

The first reason raised by the defendant relates to claim interpretation. The de-

fendant alleges that the '837 patent does not disclose a CDI system in which the charging and primary winding are "wound such that the voltages simultaneously induced therein are in-phase or of the same polarity." This argument is void of any factual or legal basis. Claim 1, specifically element 6, and dependent claims 2–5 clearly disclose a CDI system in which "the ends of said charging winding and said primary winding ... are simultaneously at the same polarity." The defendant strains the law of claim interpretation by suggesting that the presence, in element 4 of claim 1, of the words "voltages induced therein by said varying flux each includes half wave voltages of opposite polarity," effectively cancel language in the same claim disclosing wave forms which are simultaneously at the same polarity. As discussed in the sections on "validity" and "new matter" the wave forms induced in the charging and primary coils are simultaneously at the same polarity and each wave form has half wave voltages of opposite polarity. The defendant's Generation III CDI system also includes charging and primary coils in which the wave forms are simultaneously at the same polarity and each wave form has half wave voltages of opposite polarity.

In addition, the defendant alleges that the Generation III CDI is not triggered by the primary winding. This allegation is contrary to the facts of this case. The court found that based on the evidence presented, which is weighted according to the court's judgment as to credibility of the testimony of witnesses, the defendant's accused Generation III CDI system is triggered by the primary coil.

The defendant's accused Generation III CDI system does include components not required by claims 1–5, specifically a resistor. However, "such inclusion does not avoid infringement if the claims otherwise read on the accused product or process. *Loctite*, 781 F.2d at 865; *Radio Steel*, 731 F.2d at 848. The evidence reveals that the

inclusion of that resistor does not effect the readability of claims 1–5 on the accused Generation III CDI system. Claims 1–5 of the '837 patent read on the defendant's accused Generation III CDI system. Therefore, the defendant's accused Generation III CDI system infringes Claims 1–5 of United States Patent No. Re. 31,837.

Claims 6 and 7 (Appendix F) of the '837 patent are alleged to be infringed by the defendant's Generation III CDI system.[11] The defendant argues that the accused Generation III CDI does not contain some of the elements of claim 6. Specifically the defendant argues that element 1 of claim 6 which requires "an integral core of ferrogmagnetic material which includes a plurality of circumferentially spaced, radially extending leg portions disposed adjacent said circular path ..." does not read on the accused Generation III CDI system. That language is interpreted as meaning a ferromagnetic core with more than one leg; each leg is spaced around the circumference of a circle, which represents the flywheel; and each leg extends in the general direction of a radius of that circle. The information in the disclosure is consistent with that interpretation and nothing in the file history mandates a narrower construction. When comparing element 1 of claim 6 to the defendant's accused Generation III CDI system it is clear that one of the legs of the core does not extend in the general direction of a radius of the flywheel. Therefore, there cannot be any literal infringement of claim 6.

The plaintiff's allegations must now be analyzed under the doctrine of equivalents. See, *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856; *Great Northern*, 782 F.2d at 866; *Datascope*, 776 F.2d at 325; *King Instrument*, 767 F.2d at 862; *Radio Steel*, 731 F.2d at 847; *Hughes Aircraft*, 717 F.2d at 1361. The test under the doctrine of equivalents is whether the ac-

---

**11.** Although, the defendant has intervening rights relevant to claims 6–10 of the '837 patent, this discussion is included as an exercise in judicial economy, in the event that the Court of Appeals for the Federal Circuit reverses the holding of this court relevant to intervening rights.

cused product "performs substantially the same function in substantially the same way to obtain the same result" as the patent claims *Id.* The Supreme Court of the United States in *Graver Tank* "recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing." *Id.*, 339 U.S. at 807, 70 S.Ct. at 856.

The court in its findings of fact stated that the leg portions of the defendant's accused Generation III CDI systems were equivalent to those described in element 1 of claim 6 of the '837 patent. The defendant argues that the language of element 5 of claim 6 of the '837 patent does not read on the accused Generation III CDI system. The specific language is:

> said capacitor being charged by voltage of one polarity generated in said charge winding and said electronic switch means being rendered conductive by a trigger voltage the same as said one polarity which occurs during generation in the charge winding of a voltage opposite said one polarity which charges said capacitor whereby said capacitor is charged during one half cycle of voltage induced in the charging coil by changing flux in said one leg portion and discharged during the next half cycle of voltage induced in one of said coils by said changing flux in said one leg portion.

In light of the file history and the disclosure this element is interpreted to mean that the SCR is rendered conductive by a trigger voltage that is the same polarity as the voltage generated in the charge winding during the second half cycle. The claim does not assign specific polarities to the half cycles, but under the interpretation of claim 6 if the capacitor is charged by a voltage assigned a positive polarity the SCR will be triggered by a voltage assigned a negative polarity. Therefore, that element reads on the defendant's accused Generation III CDI system. Further, the defendant's Generation III CDI is triggered by voltage induced in the primary coil. Therefore, the defendant's accused Generation III CDI system infringes claim 6 and dependent claims 7, 9 and 10 of United States Patent No. Re. 31,837.

## WILLFUL INFRINGEMENT

The plaintiff alleges that the defendant's infringement was willful and that under sections 284 and 285 of Title 35 of the United States Code the plaintiff should be granted costs, increased damages and reasonable attorney fees. The court must consider "the totality of the circumstances" when determining whether a specific case is an exceptional case under sections 284 and 285. *Underwater Devices, Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1390, 219 USPQ 569 (Fed.Cir.1983); *accord, Central Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1577 (Fed.Cir.1983). The facts of this case lead the court to the brink of declaring the defendant's conduct willful infringement, but the totality of the circumstances prevents going beyond that brink. It is the plaintiff's burden to persuade this court that the defendant willfully infringed, and that burden has not been carried. Similarly, the court finds that the totality of the circumstances in this case rises to just below the level of conduct which permit the award of attorney's fees under section 285.

## SUMMARY

The plaintiff has carried the burden of proof, and demonstrated that the defendant's accused Generation I and III CDI systems infringe United States Patent No. Re. 31,837. Further, the plaintiff has carried the burden and proven that the defendant's United States Patent No. 4,228,780 and United States Patent No. 4,333,442 are invalid and unenforceable. Finally, although the intervening rights doctrine has no direct effect on this decision, the defendant has proven that the defendant could properly claim intervening rights as protection from infringement of claims 6–10 of United States Patent No. Re. 31,837.

Accordingly, and for all the above reasons, it is the **ORDER** of the Court that the

defendant, Wabash, Inc., be, and is hereby enjoined from: making, using or selling, without authorization, any product which is covered by the subject matter of United States Patent No. Re. 31,837. It is **FURTHER ORDERED** that the defendant, Wabash, Inc., be assessed damages for the manufacture and sale of the defendant's Generation I and III CDI systems. It is **FURTHER ORDERED** that the defendant Wabash, Inc., be assessed costs pursuant to section 1920 of Title 28 of the United States Code. **FURTHER** at a proper time this court will appoint a Special Master, pursuant to Rule 53 of the Federal Rules of Civil Procedure, to determine the proper damages in this case.

APPENDIX A

Figure 7 as originally filed with the application for United States Patent No. 4,036,201.

Figure 7 as modified, and as it appears in both United States Patent No. 4,036,201 and United States Patent No. Re. 31,837.

APPENDIX B

Figure 8 as it appears in both United States Patent No. 4,036,201 and United States Patent No. Re. 31,837.

1408

## APPENDIX C

Taken from the disclosure which Mr. Walters prepared for the
'780 patent application.

Figure 2

Figure 3

Figure 4

Figure 2 shows a conventional CDI circuit diagram and Figure 3 depicts
this system in a typical package application with the system positioned
adjacent to a flywheel containing a permanent magnet and pole pieces
such as to energize the capacitor charging coil $L_1$ and the primary coil
$L_2$ when it is rotated. As the leading magnet pole of the rotating
flywheel approaches the stator and the coils $L_1$ and $L_2$ magnetic lines
of force are crossed in these coils and an electrical potential or
voltage and corresponding current is induced in each coil. The winding
on coils $L_1$ and $L_2$ are wound in such a direction that conventional

current flows from y to x in $L_1$ and from z to u in $L_2$ and points x and
u are driven to a plus (+) potential. This rise in voltage is shown
graphically in Figure 4.

Note in Figure 4 the voltage rise, $v_1$, in $L_1$ is much higher than $v_2$ in $L_2$. This is because the number of turns in $L_1$ is much greater than in $L_2$. The current generated in $L_1$ will flow through diode $D_1$ and because it is blocked by the SCR, which is in a non-conducting state, the current will charge capacitor $C_1$. At the same time the coil $L_2$, which is the primary of the ignition transformer, will cause point u adjacent of $L_2$ to be driven plus (+) but not nearly as great in voltage potential as the corresponding point x of $L_1$ because $L_2$ has far fewer wire turns than $L_1$.

Because of the presence of diode $D_1$ the charge in $C_1$ will be held captive at the peak voltage $V_1$.

When the second magnet pole approaches the stator and coils $L_1$ and $L_2$ the induced voltages reverse. At this point, however, the diode $D_2$ effectively shorts out any voltage rise in $L_1$ therefore only $L_2$ exhibits an increase in voltage potential and current flows from u to z. In order for the SCR in the circuit to trigger the gate (g) must be positive with respect to the cathode (ct) and current must flow from gate to cathode. The increase in voltage and flow of current in the primary satisfies this condition therefore shortly after the voltage reversal the SCR is triggered. When the SCR is triggered the charge previously stored in $C_1$ flows through the SCR and primary coil $L_2$ which in turn induces a high voltage in $L_3$ firing the spark plug.

With the conventional circuit described above, the system experiences only a minor retard at higher speeds. Efforts to increase this retard by increasing the inductance of the primary to cause the current to lag the voltage results in lowering the output voltage of $L_3$ because of the reduced turns ratio.

## APPENDIX D

The schematic diagram which was included in the United States Patent No. 4,228,780, and is alleged to represent the circuit diagram for the defendant's accused generation III CDI system.

**Fig. 2.**

## APPENDIX E

Claims 1–5 of United States Patent No. Re. 31,837.

### CLAIM 1

1. A capacitor discharge system for an internal combustion engine comprising a permanent magnet means rotated about a circular path in synchronism with the operation of said engine,

a core of ferromagnetic material mounted adjacent said circular path and having one portion providing a path for the varying flux generated by the movement of said magnet means past said core, a

charging winding and a transformer core portion,

said charging winding being offset from said primary and secondary windings radially with respect to said circular path,

said charging winding and primary winding being wound on said one core portion such that the voltages induced therein by said varying flux each includes half wave voltages of opposite polarity,

a charging circuit including a capacitor connected across said charging winding and a diode poled to pass half wave voltages of one polarity for charging said capacitor and maintaining said capacitor charged when the voltage generated in said charging winding is opposite said one polarity,

circuit means connecting said capacitor with said primary winding for discharging said capacitor through said primary winding and including an electronic switch means having anode, cathode and control electrodes, the anode-cathode junction of said switch means interconnecting the ends of said charging winding and said primary winding which are simultaneously at the same polarity,

said control electrode being connected to the other end of said primary winding, the polarity of which is opposite said same polarity,

said switch means being nonconductive during the charging of said capacitor by said one polarity of the voltage generated in said charging coil and being rendered conductive by voltage generated in the primary winding opposite said same polarity whereby said capacitor is charged during one complete half cycle of voltage generated in the charging coil and discharged during the next half wave voltage generated in said charging winding.

2. A capacitor discharge system for an internal combustion engine as set forth in claim 1 in which said control electrode is connected by circuit means to the ends of both said primary winding and charging winding opposite to the ends of these windings interconnected by the cathode-anode junction of said electronic switch means.

3. A capacitor discharge system as set forth in claim 2 in which said circuit means connecting the control electrode to said primary and charging winding includes a resistor.

4. A capacitor discharge system as set forth in claim 3 in which said electrode switch means is a silicon control rectifier and the control electrode thereof is the gate of said rectifier, said gate electrode and the ends of said charging winding and primary winding opposite said same polarity being connected to ground potential.

5. A capacitor discharge system as defined in claim 3 further characterized by a thin wall cup-shaped housing received on said one portion of said core of ferromagnetic material and containing said primary winding, said secondary winding, said charging winding, said capacitor, and said electronic switch, and an insulated high tension conductor for connecting one end of said secondary winding to said spark plug, said housing also having a socket for receiving one end of said high tension conductor and means in said socket for making electrical connection between said one end of said conductor and one end of said secondary winding.

## APPENDIX F

Claims 6, 7, 9 and 10 of United States Patent No. Re. 31,837.

6. In a capacitor discharge system for an internal combustion engine having permanent magnet means rotatable about a circular path in synchronism with the operation of said engine, a charge coil, a capacitor connected in circuit with said charge coil and an electronic switch means which is rendered conductive in response to a trigger pulse connected to said switch means for discharging said capacitor into the primary winding of a transformer ignition coil, the secondary winding of said transformer being connected to a spark gap device for said engine, the improvement in said system comprising

an integral core of ferromagnetic material which includes a plurality of circumferentially spaced, radially extending leg portions disposed adjacent said circular path, one of said leg portions providing a path for varying flux generated by the movement thereby of said magnet means,

said charge coil being connected to charge said capacitor and together with said transformer coil being disposed on said one leg portion,

said charge coil and transformer coil being offset radially with respect to the circular path of said magnet means,

said coils being wound such that voltages simultaneously induced therein by said varying flux in said one leg portion include half wave voltages of opposite polarity,

said capacitor being charged by voltage of one polarity generated in said charge winding and said electronic switch means being rendered conductive by a trigger voltage the same as said one polarity which occurs during generation in the charge winding of a voltage opposite said one polarity which charges said capacitor whereby said capacitor is charged during one half cycle of voltage induced in the charging coil by changing flux in said one leg portion and discharged during the next half cycle of voltage induced in one of said coils by said changing flux in said one leg portion.

7. In a capacitor discharge ignition system as set forth in claim 6 wherein said charge coil is offset from said transformer coil in the direction of said rotating magnet means.

9. In a capacitor discharge system for internal combustion engines as set forth in claim 6 wherein said charge coil and transformer coils are essentially the only voltage generating coils employed in said system whereby capacitor charging, the electronic switch means triggering and the

transformer ignition functions are all performed by said charging coil and transformer coil in the absence of a separate trigger coil.

10. In a capacitor discharge ignition system as set forth in claim 7 wherein said transformer coil includes a primary winding and secondary winding disposed in generally concentric relation on said one leg portion, said charge coil being offset a substantial distance from the secondary winding of the transformer coil.